CHARLES P. TALBOT & another *vs.* CHARLES HUDSON & others.

The determination of the legislature is not conclusive that a purpose for which it directs private property to be taken is a public use; but is conclusive, if the use is public, that a necessity exists which requires the property to be taken.

In order to constitute a public use which will justify the taking of private property, it is not essential that the entire community, or even a considerable portion of it, should directly participate in the benefits to be derived from the purpose for which the property is appropriated.

A statute, providing that a large tract of land, situated in different towns and owned by a large number of persons, and overflowed by means of a dam, may be redeemed by the removal of the dam by public officers, and compensation paid out of the treasury of the Commonwealth to persons whose property is thereby injured, is a constitutional exercise of the power of taking private property for public uses.

In a statute taking private property for public uses, a provision for the assessment of damages to the owners thereof, and the payment of the same by warrant from the governor out of the treasury of the Commonwealth, is a sufficient provision for the compensation of the owners of the property taken, although the Commonwealth is not liable to be sued.

BILL IN EQUITY, filed in Middlesex by the owners of a mill, mill-dam and water rights upon the Concord River in Billerica, and of adjoining land thereon, to restrain the commissioners appointed by the governor and council under the *St.* of 1860, *c.* 211, from removing the dam erected across that river by the proprietors of the Middlesex Canal, and now belonging to the plaintiffs. A temporary injunction was issued *ex parte* on the filing of the bill, which the defendants afterwards moved to dissolve. Upon this motion the case was reserved, with the consent of the parties, for the consideration of the full court, and is sufficiently stated in the opinion.

*B. F. Thomas & J. G. Abbott,* ( *G. H. Preston* with them,) for the plaintiffs, to the point that the statute was not a lawful taking of private property for public uses, cited Declaration of Rights, arts. 1, 10, 30; *Winslow* v. *Gifford,* 6 Cush. 327; *Cushman* v *Smith,* 34 Maine, 247 ; *Vanhorne* v. *Dorrance,* 2 Dall. 310 ; *Wilkinson* v. *Leland,* 2 Pet. 657 ; *In re Albany Street,* 11 Wend. 151 ; *Bloodgood* v. *Mohawk & Hudson River Railroad,* 18 Wend. 9 ; *Embury* v. *Conner,* 3 Comst. 511 ; *People* v. *Mayor &c. of Brooklyn,* 4 Comst. 419, 430, 431 ; *Taylor* v. *Porter,* 4 Hill, 140 ; *Woodruff* v. *Fisher,* 17 Barb. 224 ; *Norman* v. *Heist,*

5 W. & S. 171; *Moale* v. *The Mayor &c. of Baltimore*, 5 Mary-
land, 314; *Harding* v. *Goodlett*, 3 Yerger, 41, 52; 2 Kent Com.
(6th ed.) 416 – 419; Sedgwick on Stat. & Const. Law, 514,
515; and to the point that the act provided no reasonable com-
pensation, further cited *Decatur* v. *Paulding*, 14 Pet. 497;
*Brashear* v. *Mason*, 6 How. 92; *Reeside* v. *Walker*, 11 How.
272; *Cohens* v. *Virginia*, 6 Wheat. 411, 412; *United States* v.
*Clarke*, 8 Pet. 444; *Briscoe* v. *Bank of Kentucky*, 11 Pet.
321; *Bonaparte* v. *Camden & Amboy Railroad*, Bald. 205;
*Hartwell* v. *Armstrong*, 19 Barb. 171; *Thacher* v. *Dartmouth
Bridge*, 18 Pick. 501; Gen. Sts. *c.* 15, §§ 30, 31; 1 Kent Com.
322 note; 2 Kent Com. 389, 417; Sedgwick on Stat. & Const.
Law, 526 – 528, 533.

*S. H. Phillips*, (Attorney General,) *& J. S. Keyes*, for the de-
fendants, referred to some of the cases cited in the opinion, and
also to *Sts.* 1783, *cc.* 20, 21; 1795, *c.* 67; 1797, *c.* 67; 1803, *c.*
98; 1809, *c.* 19; 1812, *c.* 113; 1845, *c.* 117; 1856, *c.* 289; Gen.
Sts. *c.* 43, §§ 59, 76; *cc.* 148, 149; *Hickman's case*, 4 Har-
rington (Del.) 580; *Stoughton* v. *Baker*, 4 Mass. 522; *Com-
monwealth* v. *Breed*, 4 Pick. 460; *Commonwealth* v. *Chapin*,
5 Pick. 199; *Commonwealth* v. *Alger*, 7 Cush. 53, 86, 100, 102;
*Commonwealth* v. *Temple*, 14 Gray, 69; *Stevens* v. *Middlesex
Canal*, 12 Mass. 466; *Heard* v. *Middlesex Canal*, 5 Met. 81;
*Heard* v. *Talbot*, 7 Gray, 118; *District Attorney* v. *Lynn &
Boston Railroad, ante*, 242.

    BIGELOW, C. J. This case comes before us for a hearing
upon the bill and answer, somewhat out of the regular course
of proceedings in chancery. A preliminary injunction was
heretofore issued *ex parte* by a justice of this court on the filing
of the bill. Upon the return of the subpœna, a motion to dis-
solve this injunction was made by the defendants. This motion
should properly have been heard, in the first instance, by a single
judge. But as the case of the plaintiffs, as stated in the bill,
mainly depends on the determination of certain questions of
law which can in no way be affected by proof, and as the case
is one of great importance, involving large interests both of a
public and private nature, it was agreed by the parties, with the

assent of the court, that these questions should now be heard and finally determined.

The case, so far as is necessary to an understanding of these questions, may be briefly stated thus: The plaintiffs allege that they are owners by purchase of a valuable mill privilege, water rights and dam, situated in the northern part of the town of Billerica upon the falls of the Concord River, with land in, upon and adjoining the same; that they have erected on said river, at great cost, large mills and other buildings, used and improved by them for the manufacture of various articles; that these mills are carried on and operated by the water power created by said dam and river, and are entirely dependent thereon. They further aver that the defendants, assuming to act as commissioners under and by virtue of the authority conferred by a certain act of the legislature, passed on the 4th of April 1860, entitled " an act in relation to the flowage of the meadows on Concord and Sudbury Rivers," propose to take down and remove said dam to a level thirty three inches below the top thereof, by which the water power, dam and mills of the plaintiffs will be destroyed, or rendered of little or no value, and that they will thereby be subjected to serious and irreparable loss, for which the defendants would be unable to recompense them, and of such a nature that they are remediless except by relief in equity. They then aver that said act of the legislature is unconstitutional and void, and furnishes no real authority for the threatened action of the defendants as commissioners under its provisions. The defendants, in their answer, admitting that the plaintiffs are owners of the dam, water rights, mill privileges and mills, as stated by the bill, and alleging their due appointment and qualification to act as commissioners under the act of the legislature aforesaid, aver, among other things, that said act is valid and constitutional, and well authorizes them to proceed in removing a portion of said dam in pursuance of its provisions; and they demur to the bill on the ground that the plaintiffs do not state a case which entitles them to relief in equity.

It is manifest from these averments and denials that the right

of the plaintiffs to the relief which they seek depends chiefly on the allegation of the invalidity of the act of the legislature under which the defendants claim to derive their authority to reduce the height of the dam in the manner set out in the bill. This question has been very fully and elaborately discussed at the bar, and we have endeavored to bestow upon it very careful and deliberate consideration, not only on account of the important nature of the interests involved in our decision, but also because it requires us to determine whether the legislative department of the government has not exceeded the constitutional limits of its authority.

It is quite obvious that the first step in this inquiry is to ascertain, if we can, under what head or branch of legislative power or authority the act in question falls. The intention of the legislature in this respect must be gathered mainly from the terms of the statute. There is no express declaration of the objects contemplated by it, but they are left to implication. Looking to the general structure of the act and the nature of its provisions, we cannot doubt that it was intended as an exercise of the right of eminent domain. It is similar to other legislative acts which authorize the taking of private property for a public use. It expressly authorizes the taking and removal of the dam by a board of public officers appointed for this specific purpose; it provides the same remedy in behalf of persons injured by such taking and removal as is given in case of damages occasioned by the laying out of highways; it affords to the party aggrieved by the award of the commissioners a trial by jury, and confers on this court the power to hear and determine all questions of law arising in the proceedings, and to set aside the verdict of the jury for sufficient cause. These provisions are inconsistent with the idea that the act was framed for the purpose of exercising the general police or superintending power over private property, which is vested in the legislature, or in order to prohibit a use of it which was deemed injurious to or inconsistent with the rights and interests of the public. If such were the object of the statute, there would be no necessity for the appointment of commissioners to take down and

remove the dam, or for the provisions making compensation to those injured in their property thereby. Such enactments would be unusual in a statute intended only for a prohibition and restraint upon the appropriation or use of private property by its owners; but are the necessary and ordinary provisions when the legislature intend to exercise the right to take it for a supposed public use. *Thacher* v. *Dartmouth Bridge,* 18 Pick. 501. *Commonwealth* v. *Tewksbury,* 11 Met. 55.

Such being the manifest design of the legislature in passing the act in question, we are brought directly to a consideration of the objections urged by the plaintiffs against its validity. The first and principal one is that it violates the 10th article of the Declaration of Rights, because it authorizes the taking and appropriation of private property to a use which is not of a public nature.

In considering this objection, we are met in the outset with the suggestion, that it is the exclusive province of the legislature to determine whether the purpose or object for which property is taken is a public use, and that it is not within the province of the judicial department of the government to revise or control the will or judgment of the legislature upon the subject, when expressed in the form of a legal enactment. But this position seems to us to be obviously untenable. The provision in the Constitution, that no part of the property of an individual can be taken from him or applied to public uses without his consent or that of the legislature, and that when it is appropriated to public uses he shall receive a reasonable compensation therefor, necessarily implies that it can be taken only for such a use, and is equivalent to a declaration that it cannot be taken and appropriated to a purpose in its nature private, or for the benefit of a few individuals. In this view, it is a direct and positive limitation upon the exercise of legislative power, and any act which goes beyond this limitation must be unconstitutional and void. No one can doubt that if the legislature should by statute take the property of A and transfer it to B, it would transcend its constitutional power. In all cases, therefore, where this power is exercised, it neces-

sarily involves an inquiry into the rightful authority of the legislature under the organic law. But the legislature have no power to determine finally upon the extent of their authority over private rights. That is a power in its nature essentially judicial, which they are by article 30 of the Declaration of Rights expressly forbidden to exercise. The question whether a statute in a particular instance exceeds the just limits prescribed by the Constitution must be determined by the judiciary. In no other way can the rights of the citizen be protected, when they are invaded by legislative acts which go beyond the limitations imposed by the Constitution.

But it is to be borne in mind, that in determining the question whether a statute is within the legitimate sphere of legislative action, it is the duty of courts to make all reasonable presumptions in favor of its validity. It is not to be supposed that the lawmaking power has transcended its authority, or committed under the form of law a violation of individual rights. When an act has been passed with all the requisites necessary to give it the force of a binding statute, it must be regarded as valid, unless it can be clearly shown to be in conflict with the Constitution. It is therefore incumbent on those who deny the validity of a statute, to show that it is a plain and palpable violation of constitutional right. If they fail to do so, or leave room for a reasonable doubt upon the question whether it is an infringement of any of the guaranties secured by the Constitution, the presumption in favor of the validity of the act must stand. *Opinion of Justices*, 8 Gray, 21. Besides, it is a well settled rule of exposition that in considering whether a statute is within the limits of legislative authority, if it may or may not be valid according to circumstances, courts are bound to presume the existence of those circumstances which will support it and give it validity. *Wellington, Petitioner*, 16 Pick. 96.

The ultimate purpose which the legislature had in view in passing the act under consideration does not distinctly appear by the terms of the act itself. But it may be inferred from the title of the act and the general scope of its provisions, that it

was intended to relieve the meadows lying on the borders of Concord and Sudbury Rivers, chiefly in the towns of Lincoln, Concord, Sudbury and Wayland, from large quantities of water with which they are constantly overflowed, and which are supposed to be set back by the dam owned by the plaintiffs. This purpose is quite clearly indicated by the provisions in the fourth section of the act, by which the removal of the dam under the act is made to operate as a bar to any suits by the proprietors of lands flowed thereby for damages sustained in consequence of such flowage. And indeed it is conceded by the parties that such was the main purpose of the statute.

In many cases, there can be no difficulty in determining whether an appropriation of property is for a public or private use. If land is taken for a fort, a canal or a highway, it would clearly fall within the first class; if it is transferred from one person to another or to several persons solely for their peculiar benefit and advantage, it would as clearly come within the second class. But there are intermediate cases where public and private interests are blended together, in which it becomes more difficult to decide within which of the two classes they may be properly said to fall. There is no fixed rule or standard by which such cases can be tried and determined. Each must necessarily depend upon its own peculiar circumstances. In the present case there can be no doubt that every owner of meadow land bordering on these rivers will be directly benefited to a greater or less extent by the reduction of the height of the plaintiffs' dam. The act is therefore in a certain sense for a private use, and enures directly to the individual advantage of such owners. But this is by no means a decisive test of its validity. Many enterprises of the highest public utility are productive of great and immediate benefits to individuals. A railroad or canal may largely enhance the value of private property situated at or near its termini; but it is not for that reason any less a public work, for the construction of which private property may well be taken. We are therefore to look further into the probable operation and effect of the statute in question, in order to ascertain whether some public interest or

benefit may not be likely to accrue from the execution of the power conferred by it upon the defendants. If any such can be found, then we are bound to suppose that the act was passed in order to effect it. We are not to judge of the wisdom or expediency of exercising the power to accomplish the object. The legislature are the sole and exclusive judges whether the exigency exists which calls on them to exercise their authority to take private property. If a use in its nature public can be subserved by the appropriation of a portion of the plaintiffs' dam in the manner provided by this act, it was clearly within the constitutional authority of the legislature to take it, and in the absence of any declared purpose, we must assume that it was taken for such legitimate and authorized use.

The geographical features of the Concord and Sudbury Rivers are properly within the judicial cognizance of the court. They are stated in detail in the opinion of the court in *Sudbury Meadows* v. *Middlesex Canal,* 23 Pick. 45. From that case and an inspection of the map, it appears that these two rivers, forming parts of the same stream, pass for a distance exceeding twenty miles through a tract of country, forming their banks or borders, consisting chiefly of meadows comprising many hundreds of acres; that throughout this extent the waters are very sluggish, having only a slight fall, until they reach the plaintiffs' dam. It might well be supposed that the necessary effect of an obstruction in a stream of this nature would be to cause the waters to flow back in the bed of the rivers, to fill up their courses or channels, to overflow their sides, and to inundate to a great extent the adjacent land, which is naturally low and level, and thus to render it unfit for agricultural purposes and deprive it of its capacity to produce any profitable or useful vegetation. The improvement of so large a territory, situated in several different towns and owned by a great number of persons, by draining off the water and thereby rendering the land suitable for tillage, which could not otherwise be usefully improved at all, would seem to come fairly within the scope of legislative action, and not to be so devoid of all pub-

lic utility and advantage as to make it the duty of this court to pronounce a statute, which might well be designed to effect such a purpose, invalid and unconstitutional. The act would stand on a different ground, if it appeared that only a very few individuals or a small adjacent territory were to be benefited by the taking of private property. But such is not the case here. The advantages which may result from the removal of the obstruction caused by the plaintiffs' dam are not local in their nature, nor intended to be confined to a single neighborhood. They are designed to embrace a large section of land lying in one of the most populous and highly cultivated counties in the State, and by increasing the productive capacity of the soil to confer a benefit, not only on the owners of the meadows, but on all those who will receive the incidental advantage arising from the development of the agricultural resources of so extensive a territory.

It has never been deemed essential that the entire community or any considerable portion of it should directly enjoy or participate in an improvement or enterprise, in order to constitute a public use, within the true meaning of these words as used in the Constitution. Such an interpretation would greatly narrow and cripple the authority of the legislature, so as to deprive it of the power of exerting a material and beneficial influence on the welfare and prosperity of the State. In a broad and comprehensive view, such as has been heretofore taken of the construction of this clause of the Declaration of Rights, everything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the State, or which leads to the growth of towns and the creation of new sources for the employment of private capital and labor, indirectly contributes to the general welfare and to the prosperity of the whole community.

It is on this principle, that many of the statutes of this Commonwealth by which private property has been heretofore taken and appropriated to a supposed public use are founded. Such legislation has the sanction of precedents, coeval with the origin

and adoption of the Constitution, and the principle has been so often recognized and approved as legitimate and constitutional that it has become incorporated into our jurisprudence. One of the earliest and most familiar instances of the exercise of such power under the Constitution is to be found in *St.* 1795, *c.* 74, for the support and regulation of mills. By this statute the owner of a mill had power, for the purpose of raising a head of water to operate his mill, to overflow the land of proprietors above and thereby to take a permanent easement in the soil of another, to the entire destruction of its beneficial use by him, on paying a suitable compensation therefor. Under the right thus conferred, the more direct benefit was to the owner of the mill only; private property was in effect taken and transferred from one individual for the benefit of another; and the only public use, which was thereby subserved, was the indirect benefit received by the community by the erection of mills for the convenience of the neighborhood, and the general advantage which accrued to trade and agriculture by increasing the facilities for traffic and the consumption of the products of the soil. Such was the purpose of this statute, as appears from the preambles to the provincial acts of 8 and 13 Anne, from which the statute of 1795 was substantially copied. It is thereby declared that the building of mills has been " serviceable for the public good and benefit of the town or considerable neighborhood." Anc. Chart. 388, 404.

In like manner, and for similar purposes, acts of incorporation have been granted to individuals with authority to create large mill powers for manufacturing establishments, by taking private property, even to the extent of destroying other mills and water privileges on the same stream. *Boston & Roxbury Mill Dam* v. *Newman,* 12 Pick. 467. *Hazen* v. *Essex Co.* 12 Cush. 478. *Commonwealth* v. *Essex Co.* 13 Gray, 249. The main and direct object of these acts is to confer a benefit on private stockholders who are willing to embark their skill and capital in the outlay necessary to carry forward enterprises which indirectly tend to the prosperity and welfare of the community. And it is because they thus lead incidentally to the

promotion of " one of the great public industrial pursuits of the Commonwealth," that they have been heretofore sanctioned by this court, as well as by the legislature, as being a legitimate exercise of the right of eminent domain justifying the taking and appropriation of private property. *Hazen* v. *Essex Co.* 12 Cush. 475.

It is certainly difficult to see any good reason for making a discrimination in this respect between different branches of industry. If it is lawful and constitutional to advance the manufacturing or mechanical interests of a section of the State by allowing individuals acting primarily for their own profit to take private property, there would seem to be little, if any, room for doubt as to the authority of the legislature, acting as the representatives of the whole people, to make a similar appropriation by their own immediate agents in order to promote the agricultural interests of a large territory. Indeed it would seem to be most reasonable, and consistent with the principle upon which legislation of this character has been exercised and judicially sanctioned in this commonwealth, to hold that the legislature might provide that land which has been taken for a public use and subjected to a servitude or easement by which its value has been impaired and it has been rendered less productive, should be relieved from the burden, if the purpose for which it was so appropriated has ceased to be of public utility, and its restoration to its original condition, discharged of the incumbrance, will tend to promote the interest of the community by contributing to the means of increasing the general wealth and prosperity. If the right of a mill-owner to raise a dam and flow the land of adjacent proprietors has ceased to be of any public advantage, and tends to retard prosperity and to impoverish the neighborhood, and the withdrawal of the water from the land by taking down the dam and rendering the land available for agricultural purposes would be so conducive to the interests of the community as to render it a work of public utility, there is no good reason why the legislature may not constitutionally exercise the power to take down the dam on making suitable compensation to the owner. It would only be to apply

to the mill-owner for the benefit of agriculture the same rule which had been previously applied to the land-owner for the promotion of manufacturing and mechanical pursuits.

Nor are we without precedent for acts of legislation by which private property has been taken for the purpose of improving land and rendering it fertile and productive. The *St.* of 1795, *c.* 62, for the improvement of meadows, swamps and low lands, recognizes the right of taking private property for the purpose of redeeming lands from the effects of stagnant water and of being overflowed by obstructions in brooks and rivers. This statute, re-enacted by the Rev. Sts. *c.* 115, has been long in use, and many proceedings under it have taken place, some of which have passed under the judicial cognizance of this court. But in none of these has the validity of the statute been doubted or denied. *Coomes* v. *Burt,* 22 Pick. 422. *Day* v. *Hulburt,* 11 Met. 321. Under the provisions of this act, not only is it competent to drain or overflow the land of a proprietor without his assent, and to compel him to pay a portion of the expense attendant on the proposed improvement, but also to open the flood-gates of any mill or make needful passages through or round the dam thereof and erect temporary dams on the land of any person who is not a proprietor or a party to the proceedings. For the injury thus occasioned to private property, a remedy is provided by the statute. But it is clearly an appropriation of private property primarily for the benefit of the owners of the meadows or low lands which are intended to be improved, and where the public use or benefit which justifies such appropriation consists in the indirect advantage to the community, derived from the increase of the productive capacity of the soil and the promotion of the agricultural interests of the owners of the land.

It was suggested at the argument, that there was an essential difference between the provisions of statute for the improvement of meadows and low lands and that under consideration, because by the former it was provided that the damages should be paid by the parties benefited, whereas by the latter they are to be paid out of the public treasury. But we cannot see

the force or bearing of this suggestion. The mode of compensating the party whose property is taken cannot affect the validity of the appropriation, so far as it depends on the question, whether it was taken for a public use. If the use is not in its nature public, the appropriation is invalid and unconstitutional, and the mode by which compensation to the owners of land taken is to be made is wholly immaterial. It is only when property is taken for a purpose for which it may be constitutionally appropriated, that it becomes necessary to determine whether provision is made for compensation, suitable and adequate to furnish a remedy to the party injured.

But if there were no precedent for such legislation, and if we were unable to see that any use in its nature public could be effected by the exercise of the power conferred on the commissioners by the terms of the act under consideration, we should be slow to decide, on the case as stated in the bill, that the statute was invalid, and that the legislature in passing it transcended their constitutional authority. The burden of establishing this proposition is on the plaintiffs. They are bound to make such averments in their bill, either by way of allegations of fact or conclusions of law, as *prima facie* to make it appear that the act has no force or validity. This is the basis on which their whole case rests. It is not sufficient to aver that the act is unconstitutional; because the presumption is in favor of its validity, and there is nothing on the face of the act which necessarily leads to the inference that it violates the rights of the plaintiffs. But on looking into the allegations of the bill, it does not appear that any facts are set forth which sustain the averment of the invalidity of the statute. It is not stated that the property of the plaintiffs is not taken for a public use, and that no public purpose can be accomplished by the reduction of the dam. The only allegation, having reference to the purpose of the act, is that it was designed to relieve certain meadows situated on the Concord and Sudbury Rivers from water alleged to be set back by the dam of the plaintiffs, and that this object will not be effected by the proposed reduction of the height of the dam, if the same shall be carried into effect. But it does not aver

Talbot & another *v.* Hudson & others.

that the relief of these meadows from the water with which they are overflowed is not an object of public utility for which private property may be taken. It is immaterial whether this object will be accomplished by the means proposed; that question was for the legislature to determine; the essential point which the plaintiffs must establish is, that the property was not taken or appropriated for a public use. The bill contains no such allegation. Certainly in a hearing on bill and answer, the court cannot assume the act to be unconstitutional, in the absence of any statement of facts or other averments to sustain the allegation that it takes property "for uses and purposes which are in violation of the tenth article of the Bill of Rights of the Constitution of the Commonwealth of Massachusetts." Nor is it to be overlooked in this connection, that the ordinary presumption in favor of the validity of an act of the legislature is greatly strengthened in the present case by the consideration that the power to take the property of the defendants is not delegated to any persons or corporation for their private advantage and emolument, who are to make compensation for the property taken out of their private capital or stock. But it is an exercise of the power of eminent domain directly by the State itself through agents specially appointed for the purpose, and the compensation provided for those whose property may be taken or injured by the reduction of the dam is to be paid from the public treasury. An act thus framed clearly indicates that in the judgment of the legislature it was designed to subserve some important public use, so necessary that it ought not to be left to private enterprise, and so universal that the burden of accomplishing the object should be borne, not by individuals, or corporations or towns, but by all the people of the Commonwealth. We know of no instance in the jurisprudence of this country, where an act, so clearly intended to effect a purpose which was deemed by the legislature to be of public utility, has been adjudged unconstitutional and void. Every reasonable presumption is against such a conclusion, and it would require very strong circumstances to lead the court to overrule the judgment of a co-ordinate branch of the government, so

unequivocally expressed in a matter primarily within their province to determine. .

The validity of the statute is called in question by the plaintiffs on the further and distinct ground that it contains no reasonable, certain and adequate provision for compensation to those whose property may be taken and appropriated in carrying out the purposes of the act. But it seems to us that there is an obvious and decisive answer to this objection. By the third section of the act, it is provided that the damages which may be recovered on due proceedings had by the parties injured shall be paid out of the treasury of the Commonwealth, and the governor is authorized to draw his warrant therefor. This is clearly an appropriation of so much money as may be necessary to pay the damages which may be assessed under the act. The provision could not be more explicit or definite as to the amount appropriated. Until the damages are ascertained and adjudicated, the sum which will be required to pay them is necessarily uncertain. There is no provision of law, which makes it requisite to the validity of an appropriation from the treasury of the Commonwealth that a specific sum should be named and set apart as a fund to meet a particular exigency. It is sufficient if by an act or resolve passed during the same or the preceding political year the payment is authorized. *St.* 1858, *c.* 1, §§ 1, 2. Gen. Sts. *c.* 15, §§ 30, 31. That such an appropriation affords a remedy sufficiently adequate and certain is too clear to admit of doubt. It is a pledge of the faith and credit of the Commonwealth, made in the most solemn and authentic manner, for the payment of the damages as soon as they are ascertained and liquidated by due process of law. Unless we can say that such a provision affords no reasonable guaranty that the persons injured will receive compensation, we cannot adjudge the statute to be unconstitutional. We certainly cannot assume that the Commonwealth will not fulfil its obligations. The presumption is directly the other way. Indeed the plaintiffs do not aver in their bill that the damages which may be awarded to them under the act will not be duly paid. How then can it be said that no suitable and adequate provision is made in the act, by

which the plaintiffs can receive the compensation to which they
may be entitled? The answer to the argument that no process
is provided by which the payment can be secured and enforced
is, that no such provision is necessary in cases where the power
of eminent domain is exercised immediately by the State itself,
in pursuance of a statute which enacts that compensation is to
be made by a warrant drawn by the governor of the Common-
wealth upon the public treasury. We are bound to presume
that the chief magistrate of the State will perform his duty by
drawing his warrant in conformity with the requirements of
law, and that payment of a public debt thus created will be
duly made in like manner as all public dues and liabilities are
paid out of the treasury of the State. The elementary princi-
ple that the sovereign can do no wrong is the foundation on
which rests the rule, recognized in our jurisprudence, by which
the State is exempted from being subject to process at the suit
of a creditor. The presumption of law is, that the State will
keep its faith inviolate, and honestly fulfil all its obligations.
3 Bl. Com. 255. 4 Bl. Com. 33. Broom's Max. (3d ed.) 51.
*Hill* v. *United States*, 9 How. 386. *Injunction dissolved.*