In re TUTHILL et al.

(Supreme Court, Appellate Division, Second Department. January 24, 1899.)

1. APPEAL—DECISIONS REVIEWABLE — CONDEMNATION PROCEEDINGS — DRAINAGE.

Laws 1895, c. 384, § 13, relating to the drainage of agricultural lands, provides for an order for judgment, and for a judgment, in favor of commissioners appointed in accordance therewith, by the county or supreme court, as the case may be, to determine the necessity for, and to survey, a drain, for their costs and expenses, against the petitioner for a drain where its necessity is not approved, and against the owners of land affected by the drain where it is, and the drain is surveyed by them. There is no express provision for appealing therefrom, but section 16 provides that, where the chapter is silent in respect to procedure, it shall conform as near as may be to the ordinary practice in court. *Held*, that the order and judgment affect a substantial right in a special proceeding, and are hence appealable, under Code Civ. Proc. § 1357.

2. FEDERAL CONSTITUTION—APPLICATION TO STATE LAWS.

The fifth amendment to the federal constitution applies only to the federal government.

3. EMINENT DOMAIN—NATURE OF USE—PROVINCE OF JUDICIARY.

The question whether the use for which private property is sought to be taken is private or public is for judicial determination.

4. SAME—DRAINAGE OF SWAMP LANDS.

Const. art. 1, § 7, provides that "general laws may be passed permitting the owners or occupants of agricultural lands to construct and maintain, for the drainage thereof, necessary drains, ditches and dykes, upon the lands of others, under proper restrictions and with just compensation." *Held*, that the provision changed the rule by which the drainage of swamp lands, whereby the public or some part thereof were more or less benefited, did not constitute a public use, unless a measure to preserve the public health.

5. SAME—DUE PROCESS OF LAW.

Const. U. S. Amend. 14, § 1, prohibiting any state from depriving any person of property without due process of law, does not prevent the exercise of eminent domain for the drainage of swamp lands merely for agricultural purposes, where it materially benefits a community, regardless of whether it is necessary for the public health.

6. SAME—POWER OF TAXATION—PUBLIC PURPOSES.

Laws 1895, c. 384, as amended by Laws 1896, c. 502, and Laws 1897. c. 168, confers on commissioners appointed under the chapter, on behalf of a petitioner owning agricultural land, to decide on the necessity of draining such land, and to survey the same if the necessity is apparent. the right to assess benefits against owners of land affected thereby, and to set off benefits against damages. *Held* void, since it confers a power to tax, which may be exercised in favor of a single person for the improvement of a small tract of land.

7. SAME—COMPENSATION—ASSESSMENT OF BENEFITS.

It is also void, because of the same provision, as conferring the right to exercise the power of eminent domain without requiring that compensation for the lands taken shall be absolutely made, as required by Const. art. 1, § 6.

Appeal from Orange county court.

Application of John B. Tuthill and others for the appointment of commissioners to drain certain wet and low lands in the towns of Chester and Blooming Grove, in Orange county. The county court made an order directing the clerk to docket a judgment in favor of the commissioners against Mary Rowe and others. 50 N. Y. Supp. 410.

From said order, and the judgments entered thereon, William R. Conklin and others appeal.    Reversed, and proceeding dismissed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Henry Bacon, for appellants.

F. V. Sanford (William Vanamee, on the brief), for respondents.

HATCH, J.    A preliminary question needs to be determined before we approach the main questions presented by this appeal.    It is claimed by the respondents that the appeals should be dismissed for the reason that the statute expressly prohibits any appeal except as is provided by the act in terms, and, as to the appeals for which provision is made, none has been taken; consequently that there is nothing before this court for review.    It is true that by the terms of the act an appeal is permitted, first, from the determination of the commissioners as to the necessity for the opening of a drain (sections 7 and 8, which provide that, if no appeal be taken, the action of the commissioners shall be final).    If an appeal be taken, the court shall enter an order in relation to such determination, and either reverse, affirm, or modify, which order shall be final and conclusive in relation to all matters involved in the appeal.    Second, after the award of damages, the assessment for the improvement, and the hearing of grievances thereon, the commissioners shall make a final determination, and from such determination an appeal lies to the county court; and the court, after a hearing, shall enter an order confirming or setting the same aside, "from which order there shall be no appeal."    Sections 10 and 11.    By section 13 are authorized the order and the judgment which are the subject of this appeal.    This section is silent upon the right of appeal, as is also the provision for maintenance provided by section 15, which may also result in a similar order and judgment.    By section 16 is provided a method of procedure in case the act is silent in respect thereto, which shall be such as shall conform the practice, as near as may be, to the ordinary practice in court.    It is established by authority that proceedings under similar acts are special proceedings affecting a substantial right, and as such they are appealable.    In re Ryers, 72 N. Y. 1.    As no provision is made for an appeal from the final order and judgment provided for in section 13, and as such order and judgment affect a substantial right, we think it was the intent of the legislature to leave such review to the operation of general laws, and that section 16, by apt phraseology, accomplishes such result, if the right did not exist without it.    Section 1357 of the Code of Civil Procedure provides for an appeal in a special proceeding, where such order is made by a court of record and affects a substantial right.    If section 13 restricted the right of appeal in respect of the order and judgment for which provision is therein made, as in the other sections of the act, we should still be of opinion that this appeal is properly brought.    Language which makes such orders final, and restricts the right of appeal, is itself subject to constitutional limitation.    In proceedings somewhat analagous, where such language is used, it was held to be subject to the limitation that the court had jurisdiction to make the order appealed from.    In re De Camp, 151 N. Y. 557, 45 N. E. 1039.    Such is the well-

settled rule of law.    Dudley v. Mayhew, 3 N. Y. 9; Sentenis v. Ladew, 140 N. Y. 463, 35 N. E. 650.    The distinction seems to be that, where jurisdiction is prohibited or it is expressly limited by statute, consent cannot be conferred.    Where the right is a personal privilege, it may be waived.    In the present case the jurisdiction must depend upon the terms of the statute, and, if jurisdiction for the proceeding is not found therein, then the proceeding must fail.    These questions, as we have seen, may be brought up by appeal; consequently this appeal is properly here.

This is a proceeding taken pursuant to chapter 384, Laws 1895, and has for its object the draining of certain agricultural lands situated in the county of Orange.    Amendment to this act was had in 1896 (Laws 1896, c. 502), and again in 1897 (Laws 1897, c. 168).    The proceeding was begun by the petition of 25 freeholders, on the 29th day of May, 1895.    The legislation contained in this act and its amendments is based upon the provisions of section 7 of article 1 of the state constitution, which reads:

"General laws may be passed permitting the owners or occupants of agricultural lands to construct and maintain, for the drainage thereof, necessary drains, ditches and dykes upon the lands of others, under proper restrictions and with just compensation, but no special laws shall be enacted for such purpose."

This provision is not found in any of the prior constitutions of the state, and makes its appearance for the first time in the constitution of 1894.    The framers of the provision declared its object to be to place the right of drainage of agricultural lands upon the same footing, and subject to the same rights, as then existed with respect to private roads. Record Const. Con. Col. 5, pp. 2445–2450.    The provision follows that relating to the opening of private roads, which first found place in the constitution of 1846, and was rendered necessary by the decision in Taylor v. Porter, 4 Hill, 140.    The course of constitutional legislation in respect to these two subjects—private roads and drainage—has been the same.    A statute authorizing the former was, as we have seen, condemned, although statutory authority therefor had existed since 1772.    Since the right became a principle of the constitution, its authority has, so far as we are advised, been acquiesced in, and no question has been raised but that the constitutional provision is valid legislation, under the limitation of the federal constitution.    The drainage statutes have had a slightly different experience, but in principle the same.    Legislation, culminating in the statute of 1869, upon this subject, was upheld as a valid exercise of legislative power, but upheld only so far as the taking of the lands was for a public use or purpose.    In re Ryers, 72 N. Y. 1.    This public purpose being found in that case to rest upon the preservation of the public health, power to exercise the right where this element did not exist was denied.    The constitution of 1894 sought to overcome this obstacle by the provision which it adopted.    In principle, therefore, both are alike, and authority which upholds one affords a sustaining power to the other.    Before considering the appellants' argument upon this branch of the case, it is perhaps better that we call attention to the provisions of the statute which have been adopted under this authority, and under which this proceeding is instituted, as we shall then have before us the whole subject.

The act under which the proceeding is taken, by its first section defines the term "drain," and authorizes any person owning agricultural lands to institute proceedings to drain his lands over the lands of another by presenting to the county court, or, if the lands lie in more than one county, to the supreme court, a petition asking for the appointment of three commissioners. Section 2 requires a notice to be annexed to the petition of the time and place where it will be presented to the court, and the petition and notice must be served upon the person to be affected at least eight days prior to its presentation. It then provides how the petition and notice shall be served. Section 3 provides for the appearance of infants and other incompetents. Section 4 provides for the appearance of other parties, and the service of papers after such appearance, which is conformed to similar proceedings in the supreme court. Section 5 provides for the appointment of commissioners, who must consist of three freeholders of the county in which the land is situate, not interested, and residing within the vicinity of the lands affected. These commissioners are to hear the parties, and determine (1) whether the land shall be drained or protected; (2) whether it is necessary, in order to drain the lands, that a drain shall be opened through the lands of another; (3) the amount of damage, if any, sustained by such owner by reason of the opening of such drain; (4) take such other and further steps as the act requires. Section 6 provides for the oath and organization of the commissioners. Section 7 provides for giving notice of meetings; viewing the premises; taking the proofs of the parties, which are required to be reduced to writing; and, after the testimony is closed, determine whether it is necessary that a drain shall be opened through lands of another other than the petitioner. Within 30 days after the hearing, they shall file their determination, the testimony taken, and the proceedings had, and cause notice to be given of such fact by publication in a newspaper. Section 8 provides for an appeal from such determination, and upon such appeal the court may reverse, affirm, or modify, and the order shall be final of the matters involved in the appeal. Section 9 provides for maps and surveys, and the employment of an engineer when necessary. Section 10 provides for construction and the acquisition of easements. If the petitioners or commissioners and the owner of the land through which the drain is to be opened are unable to agree upon the amount of compensation or damages which such owners are to receive, the commissioners shall determine the same, and assess the same upon the lands to be benefited by the improvement. "In assessing the damages which may be incurred, such commissioners may take into account any benefits which may accrue to the owners of such lands by reason of the construction of such drain or dyke on their lands, and may deduct the amount of such benefit from the total compensation which the owners of such land shall be entitled to receive for damages sustained by the construction and maintenance of such drain or dyke." Such damages and expenses are to be assessed in proportion to benefits received by each person. They shall cause notice to be given "to the persons whose lands are affected and who have appeared, or their agents or attorneys, of a place at which such assessment will be opened for inspection," and of a time and place when they will meet to hear grievances

and correct the assessment.   When the assessment is corrected, they shall file the same, with the time and manner of payment certified by them, and shall give notice personally if the person can with diligence be found, and otherwise if he cannot be.   Section 11 provides for an appeal.   If the assessment is confirmed, or if no appeal be taken, the petitioner or commissioners shall be entitled to enter on the land, and use the same for the purposes specified in the determination.   If the assessment is set aside, a rehearing shall be had as originally provided.   Section 12 provides for the payment of assessments.   Within 60 days after the filing, if no appeal be taken, and within 60 days after confirmation, if one is taken, or within such time as the court shall direct, the assessment shall be paid.   If the petitioner does not pay within the time required, the proceedings shall be deemed abandoned, and any money collected shall be returned.   If other persons do not pay, the assessment shall be collected as provided in the next section. Section 13 provides for the expenses of the commissioners, which are to be paid by the petitioner, if the proceedings be abandoned; if otherwise, and there is a deficiency, the same shall be assessed by the commissioners "upon the several tracts of land benefited by such improvements in proportion to the benefits which each tract receives."   Such assessment is to be filed, and notice given to "the persons who have appeared in such proceedings," personally or by mail.   Upon notice of · not less than eight days to the commissioners and other parties "who have appeared in the proceeding," any person interested, or the commissioners, may apply to the court for an order directing the entry of judgment or judgments for such costs and expenses.   The court, after hearing, may review the assessment and modify the same, and, if the proceedings have been abandoned by the petitioner, may allow the costs to the persons whose lands would have been affected, "and may direct a judgment or judgments be entered against the petitioner, or the owners of such lands, accordingly."   Such judgment may be docketed in the county clerk's office, and becomes a lien upon the real property of the debtor then in existence or thereafter acquired, and may be enforced as provided by the Code of Civil Procedure for the enforcements of judgments which are a lien upon real property.   Section 14 provides for the filling of vacancies in the office of commissioners.   Section 15 provides for maintenance, under which the commissioners may, from time to time, estimate the cost of repair and expense of maintenance for such succeeding period as they may determine, including their compensation, and assess the amount thereof on the lands benefited, as provided by section 13 of the act.   Section 16 conforms the practice, where the act is silent upon the subject, to the ordinary practice of the court, and confers upon such court power to give necessary directions.

It is claimed by the appellants that the effect of this legislation, both constitutional and statutory, is to authorize the appropriation of the land of one owner and apply it to the private use of another.   If such be its necessary construction, then both the constitution and the statute are void.   All of the authorities of all jurisdictions agree that no necessity, however great, can authorize the legislature to take the property of one man and give it to another, with or without compensation; and organic law which grants the exercise of such power is void,

by the provisions of the federal constitution, as depriving the citizen of his property without due process of law. Const. U. S. Amend. 14, § 1; Fallbrook Irr. Dist. v. Bradley, 164 U. S. 112–158, 17 Sup. Ct. 56. The fifth amendment to the federal constitution does not relate to the subject, as that applies only to the federal government. Spies v. Illinois, 123 U. S. 131, 8 Sup. Ct. 21.

We are therefore called upon to consider whether this be the necessary construction of the constitutional provision. There is no declaration contained in the provision that the taking constitutes a public use, and it is therefore argued that the provision itself shows that it contemplated taking for a private use; and this position is fortified by reference to the constitutional debates, and the claim is made that two amendments declaring the purpose of the taking to be for a public use were defeated by a vote of the convention,—thus indicating that its purpose is to take private lands for private purposes. The latter claim cannot be sustained. Reference to the record shows that the stated purpose of the amendment was to place the question of drainage upon the same ground as existed in relation to private roads. In the course of the debate, Mr. E. R. Brown said: "The drainage of lands is analagous to the private right of way, * * * and we propose to put the drainage of lands upon the same basis, guarded by the same limitations and same restrictions." He was followed by Mr. Foote, who proposed an amendment by inserting a new and additional provision, in no wise affecting this subject, but relating to the erection of works "seeking to retain, exclude, or convey water for agricultural, manufacturing, domestic, or sanitary purposes," and added that these purposes "may be declared by the legislature to be a public use." This amendment preceded the clause referring to private roads and the subject now under consideration, and contained the only declaration wherein reference was made to a public use in any of the amendments to the article as it stood in the constitution of 1846. So far as reference was made by Mr. A. H. Green that it was proposed to take private property for a public use, it was said in reference to the amendment offered by Mr. Foote, which was defeated. There is therefore nothing in the debates which lends color to the claim that the framers of the article in question intended thereby to declare a purpose to take private property for a private use. It was left as a declaration of authority to do certain things, and the extent of authority was left to be settled, as in other cases, by judicial construction. If it were otherwise, its proper construction would still be left to the courts, and, as it authorizes the exercise of the right of eminent domain, the question of what it can operate upon is the subject of judicial determination. In re Deansville Cemetery Ass'n, 66 N. Y. 569; In re Niagara Falls & W. Ry. Co., 108 N. Y. 375, 15 N. E. 429.

Is the subject-matter, therefore, a public use or purpose? Upon this subject the courts are at variance. What constitutes a public use or purpose has, so far as we are able to find, never been defined in the sense of furnishing a rule applicable to all times and cases. It is a subject which does not admit of definition, as the defined limits of to-day might not answer for the changed conditions of to-morrow. "From the nature of the case, there can be no precise line. The power

requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever-increasing necessities of society. The sole dependence must be on the personal wisdom of the sovereign authority, supervised, and, in cases of gross error or extreme wrong, controlled, by the dispassionate judgment of the courts." This was said in Olmstead v. Camp, 33 Conn. 532–551, in supporting the right, as a public use, to overflow lands by raising a dam to furnish motive power for a gristmill owned by a private person. Public benefit or utility has been held sufficient. Aldridge v. Railroad Co., 23 Am. Dec. 307; Manufacturing Co. v. Fernald, 47 N. H. 444. In Pennsylvania it was said that the public convenience was sufficient to uphold the authority. Pittsburgh v. Scott, 1 Pa. St. 309, 314. The right to authorize the drainage of large areas of swamp lands, under the exercise of the authority of eminent domain, has been supported where the controlling object was the reclamation of the land for purposes of cultivation and habitation. Tide-Water Co. v. Coster, 18 N. J. Eq. 518; Norfleet v. Cromwell, 70 N. C. 634. And in Massachusetts it was thought that the removal of a dam, by which a considerable tract of land was drained, and thereby the productive capacity of the soil was increased, resulted in a benefit to the general public by adding to the people's resources, and was sufficient to support the exercise of the power of eminent domain. Talbot v. Hudson, 16 Gray, 417. In Cooley's Constitutional Limitations the learned author states: "The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use." Page 655. And again: "But, accepting as correct the decisions which have been made, it must be conceded that the term 'public use,' as employed in the law of eminent domain, has a meaning much controlled by the necessity, and somewhat different from that which it bears generally." Page 659. The learned annotator of Judge Cooley's book has suggested that the reasoning of the cases, in many instances, brings the doctrine to rest upon grounds of general public policy, rather than upon the devotion of land to a public use. Page 653, note; also, page 660, note. And Judge Cooley asserted the same doctrine. Cooley, Tax'n (2d Ed.) 113, 114.

The changed conditions of society, and the necessities which arise therefrom, not only increase occasion for a modification and extension of the authority of eminent domain, but, at the same time, in many cases, it dispenses with a necessity for its exercise where it was formerly held to exist. It is quite evident that authority to drain lands for a mere private purpose would not be upheld, and yet might be as to the same lands, under changed conditions which showed a necessity therefor, in which the public, or some part thereof, had a more or less direct interest. While it is true that, prior to the present amendment to the constitution, the courts of this state have not recognized as sound the doctrine which we have quoted from in other jurisdictions, yet the amendment in this respect has operated to change the fundamental law, and has brought us in harmony with these decisions, so far as they affect the pending question. Under its operation, we may no longer assert that drainage of swamp lands may not be had unless it be justified as a measure to preserve the public health; but we become bound

to justify it, and not only to justify it, but to accept it, as it is the voice of sovereign authority.   If it were paramount law for the citizen as it is for the state, all debate as to its validity would be at an end.   We may therefore uphold it upon any ground that has been regarded as sufficient for that purpose, so long as we do not infringe upon the prerogative of the federal constitution.   That it may be so justified is asserted in the cases we have cited, and in a vast number of others in other jurisdictions.   Nor are we limited in this attempt by authority wholly outside of this state, as the right has been recognized by adjudicated cases in this jurisdiction.   Belknap v. Belknap, 2 Johns. Ch. 463; Beekman v. Railroad Co., 3 Paige, 45; Hartwell v. Armstrong, 19 Barb. 166.   Other cases might be cited.

In respect to the right of drainage, limitation was not placed upon the right until the Ryers Case, supra, and this went upon the ground that the constitution did not authorize an extension of the power beyond the single purpose. · But such limitation is not made absolute and controlling in the federal courts.   Mr. Justice Peckham, writing for the court in Fallbrook Irr. Dist. v. Bradley, supra, said:

"It is obvious, however, that what is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-.natter in regard to which the character of the use is questioned."

In Hagar v. Reclamation Dist., 111 U. S. 701, 4 Sup. Ct. 663, the supreme court upheld·an act of the legislature of California, authorizing the reclamation of swamp lands, as not being inconsistent with any provision of the federal constitution.   In speaking of this case in the Fallbrook Case, Mr. Justice Peckham said:

"The power does not rest simply upon the ground that the reclamation must be necessary for the public health. That, indeed, is one ground for interposition by the state, but not the only one.   Statutes authorizing drainage of swamp lands have frequently been upheld, independently of any effect upon the public health, as reasonable regulations for the general advantage of those who are treated, for this purpose, as owners of a common property.   Head v. Manufacturing Co., 113 U. S. 9, 22, 5 Sup. Ct. 441; Wurts v. Hoagland, 114 U. S. 606, 611, 5 Sup. Ct. 1086; Cooley, Tax'n (2d Ed.) 617.   If it be essential or material for the prosperity of the community, and if the improvement be one in which all the landowners have to a certain extent a common interest, and the improvement cannot be accomplished without the concurrence of all or nearly all of such owners, by reason of the peculiar natural condition of the tract sought to be reclaimed, then such reclamation may be made, and the land rendered useful to all, and at their joint expense.   In such case, the absolute right of each individual owner of land must yield to a certain extent or be modified by corresponding rights on the part of other owners for what is declared, upon the whole, to be for the public benefit."

Quite similar, and pertinent to this question, is the argument found in Norfleet v. Cromwell, supra.   It is not at all certain that the authority may not be supported under the exercise of the police power, which principle has controlled decisions favorable to its exercise in other jurisdictions than our own.   Zigler v. Menges, 121 Ind. 99, 22 N. E. 782.   Indeed, such principle has been upheld in our own courts (People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682), and supported in the supreme court (Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468).   Therein was sustained an act which regulated the charge for elevating grain, upon the ground that, although the property was private, yet

at the same time it was affected with a public interest, which was the subject of legislative control, and was therefore not in violation of the constitutional guaranty which protects private property.

In addition to these considerations, it is to be borne in mind that the fourteenth amendment to the federal constitution was not passed as a declaration of rights which aimed at the correction of abuses existing in the several states, and arising out of legislation, constitutional or statutory. No claim was ever made, so far as we are aware, that any necessity existed for such amendment in order that the liberties of the citizen, either in his person or property, might be protected from legislation then existing. In part at least, it was passed as a further declaration of rights, made necessary to supply some omissions which were thought to be insufficiently expressed, upon which subject, before that time, there had been no expression. Prior to its adoption, there was no declaration as to what constituted a citizen; there was no constitutional definition upon the subject. By the first words of the amendment, this was set at rest, and a person born or naturalized in the United States, and subject to its jurisdiction, was declared to be a citizen of the United States, and of the state wherein he resides. This was made not because citizenship did not exist; it existed before and continued thereafter. The amendment but confirmed it, and, in clear terms, defined in what it consisted. The history of the adoption of the amendment makes clear the fact that its entire substance was primarily for the purpose of enabling those persons who had just become freemen to remain secure in the possession of all their rights. Neal v. Delaware, 103 U. S. 370, 386. It was rendered necessary by conditions which existed at the close of the War of the Rebellion, and is a part of the legislation of the reconstruction period, following it. Its purpose was not to defeat legislation already existing so much as to defeat that which it was thought might be adopted. In purpose, however, and in scope, it is as broad as the jurisdiction of the United States, and protects the citizen against the action of the state, where such action is in violation of its provisions, whether the attempted exercise of power be based upon existing or subsequent legislation. Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18. It is not to be limited in its construction because it may operate upon a subject which existed before its passage, but, in construing it, it is proper that the existing conditions upon which it was expected to operate should be understood. It was proposed in congress on the 16th day of June, 1866. Its ratification was announced by the secretary of state on July 28, 1868. It can scarcely be within the reasonable contemplation of any person that by this amendment was intended to be destroyed the constitutional provision of this state that a private right of way might be forced to enable the citizen to make beneficial use of his land, and which had then found place in our constitution, and been acted upon, for 22 years, or that it intended to render invalid similar provisions in other state constitutions, or to declare null the decisions of the state courts sustaining such legislation as sound in principle, where there existed no specific constitutional provision conferring the authority. Such result would be far-reaching. Prior to the adoption of the fourteenth amendment, the constitution of the state of Michigan contained a provision similar to

our own, and the decisions in a great majority of the states supported the exercise of the power of eminent domain in its application to private roads, mills, drainage, and other similar subjects. In several states, since the amendment, similar provision has been placed in many constitutions. This is true of Missouri, Illinois, South Carolina, Colorado, Idaho, Montana, and Washington. Controlling reasons must be held to exist before the court shall say that a principle which existed before the amendment, and which has been so extensively adopted since, is null and void.

It was said by Judge Gray in People v. Sickles, 156 N. Y. 541, 548, 51 N. E. 288, 290: .

"It is not beyond the legislative power to regulate what shall be the due process of the law by which the citizen may be put upon his trial concerning his liberty or his property, provided that the statute destroys none of those safeguards to individual freedom and right which the people of England finally acquired for themselves, and which, as part of the common law of that land, we took over and adopted in the formation of a state government. They are preserved to all persons by the constitution of the state, and it is the duty of the judicial branch of the government to uphold them whenever brought into question."

The principle must be the same which upholds as secure those constitutional guaranties which the states have adopted for the security and preservation of the rights of their citizens. The principles which have been expressed therein, which have been upheld as beneficial, and which have been practically applied in uniform course, are to be regarded as having been founded upon justice, and recognized as such by federal authority. Where such power and authority are found to have had existence for a long period of time, and the states have uniformly exercised the power, amendments to the federal constitution are presumed to have been passed in the light of such circumstances, and should not be held to so operate as to invalidate the law, or destroy the principle under which the authority is exercised, unless the language of the amendment clearly works such a result.

As applied to the present conditions, we feel quite confident in asserting that it was not within the fair purport of the fourteenth amendment to the federal constitution that it should operate in destruction of the principle expressed in the state constitution respecting the private right of way, either as to it or to any other subject-matter upon which such principle can similarly operate. Upon the contrary, we think the true construction to be that those powers which are granted in state constitutions, and which were in usual and uniform exercise, when the amendment took effect, and which are not clearly within its provisions, remained unaffected. Otherwise it must be asserted that the state, by its ratification of the amendment, deliberately intended to destroy in part its fundamental law, from which its citizens derived a privilege of much practical value, and which had been a part of its constitution and policy for many years prior to the ratification of this amendment.

It is not necessary that we should further pursue the discussion of this subject. The examination leads us to say that there is much reason in the claim that the constitutional provision does not conflict with the federal instrument, and that, within proper limits, the power may

be exercised.   The provisions of this act authorize an owner of agricultural lands to institute the proceeding.   In this respect it is not as broad as the constitutional provision, as that confers the authority upon occupants of lands as well as owners.   It is manifest that, if the authority is sought to be exercised by an individual owner, his position would come squarely within the principle which supports the exercise of the right in respect to the private right of way; that is, it rests upon the ground ex necessitate, and is founded in the public policy of the state.   The right of the citizen to enjoy the use of his lands, to bring them under cultivation, and to distribute the product of his land among the people generally, is, to a limited extent, a matter in which the general public have an interest.   This, when coupled with the performance of those duties which the law devolves upon him as a citizen of the state, makes the exercise of the right a matter of public benefit and utility, sufficient to support the authority which underlies the exercise of the right, within the authorities which we have heretofore cited.   But the exercise of this authority can never be accompanied with the right to levy an assessment upon the owner of the lands which are taken for the purpose.   Such authority is not granted in the article of the constitution where the right to pass the law is found. The right conferred is to exercise the power of eminent domain, and this requires that compensation for the lands taken shall be absolutely made.   No compliance short of this will satisfy the constitutional guaranty.   Const. art. 1, § 6; People v. Mayor, etc., of Brooklyn, 4 N. Y. 419; Genet v. City of Brooklyn, 99 N. Y. 296, 306, 1 N. E. 777. The authority which confers the right upon railroads and other improvements of public benefit requires the full value to be paid to the owner without deduction.   This rests upon a sound principle, clear in itself, and yet it is often confounded with another principle, equally clear.   The right to levy an assessment, either as a direct tax or to set off benefits against damage sustained, where land is taken for a public use, is not an exercise of the power of eminent domain, but of taxation. In re Van Antwerp, 56 N. Y. 261; Improvement Co. v. Cook, 3 App. Div. 164, 38 N. Y. Supp. 222.   This authority resides in the legislature, and is absolute, within constitutional restraints.   Weismer v. Village of Douglas, 64 N. Y. 91.   The legislature has no authority to confer the power of taxation upon a private corporation, or upon an individual, or upon a public corporation, or a body of persons, to be exercised for the benefit of an individual.   The right of the state or a municipality to assess a tax upon the land not taken, to pay for that part which is appropriated, rests upon the principle that those bodies possess or are vested with the power of taxation, and therefore authority exists to assess for benefits conferred by the public improvement, whether the same be general or local.   Bohm v. Railway Co., 129 N. Y. 576, 586, 29 N. E. 802.   It is manifest, however, that such rule can have no application to the right of drainage by an individual, or to the forcing of a private right of way.   No such authority could be conferred upon the person seeking to force the right of way, either for water or travel. While the public advantage, derived from the exercise of this right in favor of a private individual, is sufficient to save the provision of the state constitution authorizing it from condemnation as violating the

fourteenth article of the federal constitution, that no one shall be deprived of his property without due process of law, still it is not sufficiently direct, and is too far coupled with a private interest, to justify, resort to taxation, as, in effect, it would authorize a tax for the benefit of a private person. Where the right is exercised of·necessity, and the public use is no greater than that derived from the private road, or the draining of the land of a single owner, or a small quantity of land, we think that no principle authorizing the exercise of the power of taxation can be made to apply to such a case.

We are not to be understood as asserting by this conclusion that the power of taxation can in no case be exercised in connection with authority to drain lands conferred by this article of the constitution. On the contrary, we think that such right may be upheld in a proper case. It was so upheld in Hagar v. Reclamation Dist., 111 U. S. 701, 4 Sup. Ct. 663, where Mr. Justice Field, in writing for the court, said:

"It is not open to doubt that it is in the power of the state to require local improvements to be made which are essential to the health and prosperity of any community within its borders. * * * It may possibly be that in some portions of the country there are overflowed lands of so large an extent that the expense of their reclamation should properly be borne by the state. * * * Whenever a local improvement is authorized, it is for the legislature ·to prescribe the way in which the means to meet its cost shall be raised, whether by general taxation, or by laying the burden upon the district specially benefited by the expenditure."

It is quite evident that the supreme court regarded the subject-matter as not only proper for the levying of a local assessment upon a territory benefited by the improvement, but that a case might exist in which the territory reclaimed might be so large, and the consequent benefit to the public so great, as to make it a matter of general public concern, under which the state might properly assume the burden. It would be impossible for the state to perform a work of such character unless it resorted to taxation, and the right to levy direct taxes or to set off benefits in such a case would inhere to the right to exercise the power, as in the construction of canals, public buildings, roads, bridges, and levees. The principle of the case we have cited was applied, and the doctrine somewhat extended, in the Fallbrook Case, supra. Therein it was asserted, as we have seen, that the right of the state to authorize the drainage of swamp and low lands was a settled principle of law, authorizing the exercise of the power of eminent domain and of taxation. Upon this principle, the court held that power not only existed to reclaim low lands, but to irrigate arid lands. The application of the principle accomplished the same result in both cases, i. e. the reclamation of land, and both are made to rest upon the ground of public benefit and utility. The limitation placed upon this right is that it must be, in some sense, founded upon a necessity, and result in bringing into existence considerable tracts of land, which may be profitably cultivated for any purpose which will make the land reasonably remunerative. 164 U. S. 160, 17 Sup. Ct. 56. The application of these principles would seem to authorize the exercise of the power of eminent domain and of taxation in a case where a considerable tract of land may be reclaimed, as thereby the public good would be conserved, and it might authorize its application to a

small tract, where the necessity was urgent, and a considerable body of the people would be favorably affected thereby. It is not difficult to imagine that along the Atlantic coast, or in contiguity to water courses flowing through a nearly level country, exist large tracts of uncultivatable land, which may form the large part of a township. In such case the right to exercise the power would be clear, even though the contiguous country be sparsely settled. In another place the tract of land may be considerably smaller, but the population more dense, and thus the public benefit be made clear. It is not easy to draw a line, and say when the principle shall be applied and when it shall be denied. It is of that class of cases which Mr. Justice Miller said could only be determined "by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." Davidson v. New Orleans, 96 U. S. 97, 104.

The California cases, where these questions have arisen, which we have cited, involved enormously large tracts of land; and it is evident that their disposition was in part controlled by the fact that the reclamation of these waste places and deserts would result in making the land profitable, and the country inhabitable, coming, in time, to be more or less densely populated. This, in every sense and from every point of view, inures to the public good. The same principle applies to these places already densely populated, as compared with the newer states. The tracts of land to be reclaimed may not be so great in extent, but the necessity affects, or may affect, as great a number of people, or more. These people may need places of habitation, or the products of the land, for their comfort and prosperity, which may be denied, in whole or in part, if the improvement cannot be made; so that, in either class of cases, we think the principle applies.

These questions are for solution by the legislature, subject to supervision by the courts. If we are correct in these views, it follows that this act may not be upheld. Under its provisions, the authority to tax may be exercised in favor of a single person, for the improvement of a single acre of agricultural land,—a result which we feel certain was not within the contemplation of the framers of the constitutional provision.

There are other special and particular provisions of the act which we also regard as obnoxious to the constitution. Attempt has been made to correct these by subsequent legislation, which we think was ineffectual for the purpose. It is not profitable, however, that we discuss these questions, as our decision is made to rest upon the broader ground.

For the reasons we have assigned, it follows that the judgments and orders must be reversed, and the proceeding dismissed.

Orders and judgment reversed, with $10 costs and disbursements, and proceedings vacated and set aside, with $10 costs. All concur; GOODRICH, P. J., in result.