In the Matter of the Petition of JOHN B. TUTHILL et al. for
the Appointment of Commissioners to Drain Certain Wet
and Low Lands in the Towns of Chester and Blooming
Grove in Orange County.

JOHN B. TUTHILL et al., Appellants; RESTCOME P. CONKLIN,
et al., Respondents.

CONSTITUTIONAL LAW — DRAINAGE ACT (L. 1895, CH. 384) NOT AUTHOR-
IZED BY ART. 1, SECTION 7, STATE CONSTITUTION, AND IS VOID. The enact-
ment of chapter 384 of the Laws of 1895, providing for an apportionment
of the damages and expenses incurred in the drainage of agricultural·
lands over the lands of others, between the petitioners thereunder and the
owners of the lands taken, in proportion to the benefits received, exceeded
the authority conferred upon the legislature by the provisions of the State
Constitution as amended in 1894 (Art. 1, § 7), that general laws may be
passed permitting the owners or occupants of agricultural lands to con-
struct and maintain for the drainage thereof necessary drains, ditches
and dykes upon the lands of others, under proper restrictions and with
just compensation, and such act is therefore void.

*Matter of Tuthill*, 36 App. Div. 492, affirmed.

(Argued March 26, 1900; decided May 15, 1900.)

APPEAL from an order and judgment of the Appellate
Division of the Supreme Court in the second judicial depart-
ment, entered January 30, 1899, reversing certain orders and
judgments of the Orange County Court, entered in a special
proceeding for the drainage of agricultural lands, and dis-
missing the proceeding.

The nature of the proceeding and the facts, so far as mate-
rial, are stated in the opinion.

*John G. Milburn* and *F. V. Sanford* for appellants. The
Drainage Act of 1895 is authorized by the Constitution of
the state. (Const. of N. Y. art. 1, § 7; *People ex rel.* v. *Bd.
of Suprs.*, 147 N. Y. 15; *People ex rel.* v. *Rice*, 135 N. Y.
473; Cooley on Const. Lim. [6th ed.] 78, 79; *Kilgour* v.
*Drainage Comrs.*, 111 Ill. 350; *People ex rel.* v. *Roberts*,
148 N. Y. 360; *People ex rel.* v. *Potter*, 47 N. Y. 375;
*Smith* v. *People*, 47 N. Y. 330; *Matter of Drainage*, 35 N.

J. L. 497; *Ross* v. *Davis*, 97 Ind. 79.) The act as a measure for the drainage of wet lands for agricultural purposes is not violative of the Federal Constitution. ( *Wurts* v. *Hoagland*, 114 U. S. 606; *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9.) If the act be susceptible of a constitutional as well as an unconstitutional operation it may not be held to be unconstitutional. It is the function of the courts as to such a statute to restrict it to its constitutional purposes. (Cooley on Const. Lim. [6th ed.] 213, 214; *People ex rel.* v. *City of Rochester*, 50 N. Y. 525; *People ex rel.* v. *Briggs*, 50 N. Y. 553; *People ex rel.* v. *Terry*, 108 N. Y. 1; *Matter of Ryers*, 72 N. Y. 1; *Matter of N. F. & W. Ry. Co.*, 108 N. Y. 375; *P. W. W. Co.* v. *Bird*, 130 N. Y. 249; *Matter of Burns*, 155 N. Y. 23; *F. I. District* v. *Bradley*, 164 U. S. 112; Cooley on Taxn. [2d ed.] 617.) There is no defect in the act either as to the mode or principle of the assessment of the expense which renders it unconstitutional. (*Matter of Common Council of Amsterdam*, 126 N. Y. 158; *People* v. *Turner*, 117 N. Y. 227; *Spencer* v. *Merchant*, 100 N. Y. 585; 125 U. S. 345; *Matter of Vil. of Middletown*, 82 N. Y. 196; *Davidson* v. *New Orleans*, 96 U. S. 97; *Genet* v. *City of Brooklyn*, 99 N. Y. 296.) It is a proper exercise of the power of the legislature to establish regulations by which adjoining lands held by various owners in severalty, and in the improvement of which all have a common interest, but which by reason of the peculiar natural condition of the whole tract cannot be improved or enjoyed by any of them without the concurrence of all, may be reclaimed and made useful to all at their joint expense. (*Lowell* v. *City of Boston*, 111 Mass. 454; *Wurts* v. *Hoagland*, 114 U. S. 606; *Head* v. *Amoskeag Mfg. Co.*, 113 U. S. 9; *Henry* v. *Thomas*, 119 Mass. 583.)

*Henry Bacon* and *Joseph Merritt* for respondents. The amendment to the Constitution and the statute authorize the taking of private property for a use not public, but strictly private, by the exercise of the right of eminent

domain.  The right of eminent domain is one residing in the state which can be used only for public purposes; and any attempt to exercise that right for any other than a public purpose violates the Constitution of the United States. (Const. U. S. art. 1, § 10; Const. U. S. Amend. arts. 5, 14; Cooley on Const. Lim. 655; *Terret* v. *Taylor,* 9 Cranch, 43; *Wilkinson* v. *Leland,* 2 Pet. 627; *Cole* v. *La Grange,* 113 U. S. 1; *C. P. D. Co.* v. *Hooper,* 2 Met. [Ky.] 350; *Reeves* v. *Treasurer of Wood County,* 8 Ohio, 333; *Beekman* v. *R. R. Co.,* 3 Paige, 44; *Varick* v. *Smith,* 5 Paige, 137; *Matter of Albany Street,* 11 Wend. 151.)  The validity of the attempt to assess the landowners in this proceeding depends upon the statute only, and is in violation of both the State and Federal Constitutions.  (Cooley on Taxn. 103, 104, 113; Cooley on Const. Lim. 606; *Loan Assn.* v. *Topeka,* 20 Wall. 655; *Cole* v. *La Grange,* 113 U. S. 1; *Parkersburg* v. *Brown,* 106 U. S. 487; *F. I. District* v. *Bradley,* 164 U. S. 112; *Weismer* v. *Vil. of Douglas,* 64 N. Y. 91; *Butler* v. *Supervisors,* 26 Mich. 22; *Jenal* v. *G. I. D. Co.,* 12 Neb. 163.)

Gray, J.  This was a proceeding instituted by the petitioners for the purpose of causing certain low and wet lands, in the county of Orange, in this state, of which they were the owners, to be drained through ditches to be constructed over the lands of others, and the warrant for its commencement and for the various steps which have been taken is claimed to be found in chapter 384 of the Laws of 1895.  The act provided, in its first section, that " a person owning agricultural lands within this state may institute proceedings for the drainage of such lands or the protection thereof from overflow, by the construction and maintenance of a drain or dyke, on the lands of another person, or the use of mechanical devices, by presenting a verified petition to the county court of the county in which such lands are located, or if in more than one county, to a special term of the supreme court of the district where the lands or a part thereof are situated, setting forth a general description of the lands to be drained or pro-

tected, the names and places of residence of the owners of all lands affected by the proceeding, so far as the same can with reasonable diligence be ascertained, and a prayer for the appointment of three commissioners." Other sections provide for the service of a notice of the time and place of the presentation of the petition and regulate matters of procedure. They provide for the appointment of three disinterested and resident commissioners, who are to hear the parties and determine whether the lands shall be drained; whether for that purpose it is necessary that a drain shall be opened through the lands of another; what the amount of damage, if any, sustained by other landowners by reason of the opening of the drain and any other and further steps with reference to the proceeding. They provide for the organization of the commissioners as a board and, after viewing the premises and taking proofs, for a determination as to the necessity for the opening of the drain as prayed; for the filing of that determination and for publication of a notice thereof; for further proceedings thereafter in the making of maps and surveys; for the construction of the work and, in the case of an inability to agree upon the amount of compensation and damages, for the determination thereof by the commissioners and an assessment upon the lands to be benefited. The commissioners are to take into account any benefits accrued and may deduct the amount of the benefit from the amount of the damage. The damages and expenses are to be assessed in proportion to the amount of benefit received. Notice is to be given to the persons whose lands are affected and who have appeared on a hearing upon the assessment, and thereafter a corrected assessment roll is to be filed and personal notice thereof given. Provision is made for an application by the commissioners for judgments against any persons not having paid the assessment and such judgments shall be docketed and become a lien upon lands, enforceable as provided in such cases by the Code of Civil Procedure. As briefly as possible, this survey of the act presents its principal features.

The petitioners in this proceeding followed the procedure of the act and commissioners were appointed by the County Court; who determined in favor of the drainage prayed for and as to its manner, and who borrowed moneys, under orders of the County Court, and caused the ditches to be constructed. They made an assessment of the damages and expenses upon the lands of various persons, including these respondents, and gave notice of a hearing of any person aggrieved by the same; which was had and a corrected assessment roll was thereafter made and filed. Subsequently, application was made by the commissioners to the county judge for an order directing the entry of judgments against various landowners, who had not paid their assessments; which was granted. These respondents, who opposed the assessment and the application of the commissioners for the judgments, appealed from the order of the county judge and from the judgments entered thereupon to the Appellate Division; where the order and the judgments were reversed and the proceeding was dismissed, upon the ground, in substance, that the act of 1895 was unconstitutional for authorizing the exercise of the power of taxation in favor of a single person. The commissioners and certain of the petitioners, then, appealed to this court.

The question, which we have before us, involves, primarily, the consideration of the amendment of section seven of article one of the State Constitution, adopted in 1894; which is relied upon as validating the enactment by the legislature of the Drainage Act of 1895. The section of the Constitution referred to reads, in its entirety, as follows : " When private property shall be taken for any public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law. Private roads may be opened in the manner to be prescribed by law; but in every case the necessity of the road and the amount of all damage to be sustained by the opening thereof shall be first determined by a jury of freeholders, and such amount, together with the expenses

18

of the proceeding, shall be paid by the person to be bene-fited.  *General laws may be passed permitting the owners or occupants of agricultural lands to construct and maintain for the drainage thereof, necessary drains, ditches and dykes upon the lands of others, under proper restrictions and with just compensation, but no special laws shall be enacted for such purposes.*"  The portion of the section italicized con-tains the amendment in question, and it is objected to it that it is violative of the Federal Constitution; in that the taking of private property for a use, not public, but strictly private, is authorized, by the exercise of the right of eminent domain.

If the amendment is in conflict with any of the provisions of the Federal Constitution, it must fail; for, within its sphere of operation, that instrument is supreme and, no more by constitutional provisions than by legislation, can the states of the Union override its prohibitions.  It is an ancient princi-ple, which entered into our social compact, that the use for which private property may be taken must be a public one; whether the taking be by the exercise of the right of eminent domain, or by that of taxation.  The sovereign power is incapable of conferring any right to interfere with private property, except it be needed for public objects.  To take land for any other than a public use; to take it from one citizen and to transfer it to another, even for full compensation, would be to violate the contract by which the land was origi-nally granted by government.  (*Beekman* v. *S. & S. R. R. Co.*, 3 Paige, 45, 73; *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9.)

The fourteenth amendment of the Federal Constitution, in prohibiting a state from depriving any person of life, liberty or property, without due process of law, protects the citizen against the taking of his property for any other than a public use, either under the guise of taxation, or by the assumption of the right of eminent domain.  (*Fallbrook Irrigation Dis-trict* v. *Bradley*, 164 U. S. 158.)  It is a security against the arbitrary spoliation of property, or any abridgment of the immunities of citizens of the United States.  The State Con-

stitution, from the beginning, by authorizing the appropriation of private property for public use, impliedly, declared that for any other use private property should not be taken from one and applied to the private use of another. (*Matter of Albany Street,* 11 Wend. 149.)

It was observed by Judge DENIO, in *People* v. *Smith,* (21 N. Y. at p. 598), that it would not be due process of law to "appropriate the property of one citizen for the use of another, or to confiscate the property of one person or a class of persons, or a particular description of property upon some view of public policy, where it could not be said to be taken for a public use." Whether that is a public use, for which private property is authorized to be taken, will depend upon the object aimed at and whether the plan has such an obvious, or recognized, character of public utility, as to justify the exercise of the right of eminent domain, or of the power of taxation, in its favor. I suppose, in that consideration, when some new constitutional provision is in question, regard should be had to prior conditions, in the laws and in the decisions of the courts of the state upon the subject, which illustrate some settled policy of the community. That can be understood by reference to the cases which arose under the Mill Acts in the New England states, the Irrigation Acts in the Western states and the Drainage Statute of New Jersey. (*Head* v. *Amoskeag Manufacturing Co.,* 113 U. S. 9 ; *Wurts* v. *Hoagland,* 114 ib. 606 ; *Fallbrook Irrigation District* v. *Bradley,* 164 ib. 112.) The statutes, in those cases, were justified, either in view of a policy in force prior to the adoption of the state constitutions ; or, within a similar principle, by long exercise of a legislative power which the state courts had sustained. In *Wurts* v. *Hoagland,* the New Jersey Drainage Statute discussed was framed in the public interest. It authorized the board of managers of the geological survey, " upon the application of at least five owners of separate lots of land, etc.," to examine the tract and, if they deemed it for the interest of the public and the landowners affected thereby, to adopt a system of drainage and to report it to the Supreme

Court of the state, etc. It was observed in the opinion that several drainage laws and the assessment of the expense of the work upon all the lands in the tract in question, "have long existed in the state of New Jersey and have been sustained and sanctioned by the courts under the constitution of 1776, as well as under that of 1844;" and the case was held to come "within the principle upon which this court upheld the validity of General Mill Acts in *Head* v. *Amoskeag Mfg. Co.* (113 U. S. 9)." In *Fallbrook Irrigation District* v. *Bradley*, the California Irrigation Act was upheld, in view of the various enactments, constitutional and legislative, together with the decisions of the state court, that such a use of water was a public one. It was observed that they were not binding upon the court; but, in their light, and under the facts and circumstances surrounding the subject-matter, in regard to which the use was questioned, there could be little difficulty in arriving at the same conclusion as the California court. The provision for the opening of private roads, in the constitutional section under consideration, represented a public policy dating from 1772, when the first statute upon the subject was enacted. This statute continued in full and active operation as a law of the state upon the adoption of our Constitution in 1777, which continued such parts of the common law in force, as had formed the law of the colony. It was embodied in the Revised Statutes (1 R. S. 513, §§ 54, 77, 79), and then, in 1846, was added to the Constitution. It was an evident public policy of the state, long acquiesced in, that facilities should be furnished for private ways, so that the property of citizens might be made accessible. (*Satterly* v. *Winne*, 101 N. Y. 218, 225.) Judge Cooley, in his work on Constitutional Limitations (*p. 532), observed that the common law has never sanctioned an appropriation of property upon such considerations as the improvement and cultivation of the wild lands of the state, the drainage of low lands, etc., and that some further element must be involved before the appropriation can be regarded as sanctioned by our Constitutions. He, further, remarked that: "the reason of the case and the set-

tled practice of free governments must be our guides in determining what is, or is not, to be regarded as a public use."

In this state, prior to the adoption of this constitutional amendment, a general drainage law appeared in the Revised Statutes (2 R. S. 548); but it was very early declared by this court to be unconstitutional, as authorizing the taking of the property of the owner of the land and transferring it to the applicant for the ditch against the consent of the owner. (*Gilbert* v. *Foote*, not reported, but cited in *White* v. *White*, 5 Barb. at p. 483, in 1849, and referred to in *Matter of Ryers*, 72 N. Y. 1.) It was said of *Gilbert* v. *Foote* by Judge FOL-GER, in *Ryers*' case, that, "it is understood that the judgment of this court went mainly upon the ground that the act sought to permit the taking of private property for a private use, which was not a use for a private way." In 1869 a general act for the drainage of swamps and the like was passed, (Chap. 888, Laws of 1869), the constitutionality of which was challenged in *Ryers*' case. It contained a provision that the commissioners appointed by the court upon the application of the petitioners should determine, not only the question of the necessity of the ditch for the drainage purposes, but "whether it is necessary for the public health," and other provisions restricted the purpose of the proceeding to that of the benefit of the public health. Such provisions were, doubtless, inserted in amendment of the prior general drainage statute and to obviate the objection to its constitutionality. (*Matter of Draining Swamp Lands, etc.*, 5 Hun, 116.) The opinion of this court in *Ryers*' case proceeded upon the proposition of the right to take private property for public use, making due compensation therefor, and that the maintenance and promotion of the public health were matters of public concern. It was held to be a constitutional power of legislation to provide for removing or abating that which has become a public nuisance, injuring the public health. "We are not called upon in this case," Judge FOLGER observed, "to uphold an act which has for its purpose the benefit of individuals. As before said, it avows, and avows only, a public purpose. * * *

We wish to be distinctly understood, that we sustain this act as constitutional solely, for that it plainly has for its purpose the preservation and promotion of the public health." A reading of the act of 1869 makes it perfectly apparent that within its scope the object of drainage proceedings was confined to cases where they were demanded in the interest of the public health.

It must be conceded, therefore, that, up to 1894, such a drainage proceeding as would be authorized under this amendment to our Constitution, being for a private purpose, was neither sanctioned by the laws, nor upheld by the courts. The policy of the state, thus evidenced, was manifestly founded on the sanctity of private property rights under the social compact and was adverse to any legislation which would violate it. It was well within the legislative power to make the state the sole actor and in the interest of a public necessity, or convenience, to authorize such interference by the public authorities with private rights as would abate conditions prejudicial to the health, or comfort, of the community; or to authorize private persons to take the initiative in the same direction of public utility. In the drainage statute in question in *People ex rel. Cook* v. *Nearing*, (27 N. Y. 306), for instance, the legislature appointed the commissioners to drain the wet and swamp lands of the town of Cicero and directed their procedure. The state was the actor in the matter and thus the presumption of a public purpose or necessity was conclusively furnished. The legislative action was similar in the acts referred to in *Hartwell* v. *Armstrong*, (19 Barb. 166), and in *People ex rel. Parker* v. *Jefferson Co. Court*, (55 N. Y. 604). But, lacking public ends, I find nothing in the past political history of the state which would justify laws, by which a citizen may be authorized to take the property of his neighbor by the exercise of the right of eminent domain, for a purpose which is primarily for his private benefit; although, incidentally, of such possible benefit generally, as any improvement of agricultural lands would result in. Such legislation is not sound in principle and we are not embarrassed by any long acquiescence,

or by either judicial or legislative precedents, in so asserting; or in holding that no imperative reasons of public policy warrant the delegation of the power to exercise the right of eminent domain in such cases.

When the Constitution of this state was amended in this way by the people, in 1894, it was intended, undoubtedly, by embodying in the organic law an authorization for the passage of general laws permitting owners of agricultural lands to construct and maintain ditches for the drainage of their properties, to conclusively sanction such legislation thereafter. The probable intent of any law may often be stated from a consideration of the political conditions which existed; the presence of which might be deemed, not unnaturally, to operate upon the lawmakers. An amendment of the organic law of the state represents the expression of the dominant popular sentiment upon the subject and in this instance it, undoubtedly, represents a purpose to make that lawful which before was not. The reasoning would be that, if it was unconstitutional and, therefore, unlawful before to authorize the taking of private property for the private purpose of the drainage of agricultural lands, by giving it constitutional warrant, it would become lawful to do so; if, indeed, the plan might not be perforce invested with a public interest. But this result would, and should, not be attained, if the constitutional amendment was in conflict with those provisions of the supreme law of the land, embodied in the Federal Constitution, which guarantee the citizen against the taking of his life, liberty or property without due process of law. The amendment of our Constitution does not, in terms, declare its object to be a public one. Indeed, I think that its language, by a fair reading, rather negatives such an inference and imports that the object is the private benefit of the landowner; for the purpose is stated to be the drainage only of his lands and he is to make just compensation for the land appropriated to that purpose. I conceive the proper rule of construction to be that, if the amendment expressed a purpose theretofore recognized as public, it would afford that sufficient sanction for subsequent legislation

on the subject which might be needed. But, if the object had been theretofore deemed not of a public nature, or of public concern, and it touches some personal immunity secured by the law of the land, its presence in the Constitution will not have the effect of removing the fundamental objection to it. I do not believe that the People of the state can affect, or impair, the obligation of the social compact by adopting as a part of the organic law a provision which will permit of the taking of private property for a purpose, which is essentially of private benefit and which has always been held to be such. When the amendment says that "general laws may be passed permitting the owners and occupants of agricultural lands to construct and maintain for the drainage thereof necessary drains, etc.," it means that the legislature may authorize any such person to take another's land for a purely private purpose and that is in conflict with the inhibition of the Bill of Rights and violates the guarantees of the Federal Constitution. If the citizen invokes the guarantees of the Federal Constitution for his protection against the enforcement of a law, which an amendment of the State Constitution purports to authorize, I perceive no valid reason, if he is right in his claim to protection, that we should not recognize it. I am not able to resist the conclusion that the constitutional amendment in question is invalid and inoperative.

If, however, the amendment in question can be upheld as valid, upon the assumption that it removes a constitutional limitation upon legislation providing for the drainage of agricultural lands and that it can rest for its justification upon a common local necessity, independent of the public health, and concerning the promotion of the prosperity of the community, then it seems clear to me that it affords no warrant for the enactment of this drainage law. The section of the article of the Constitution, to which the amendment was added, prescribed the tribunal which shall ascertain the compensation to be made for the private property "taken for any public use," and then proceeded to provide for the opening of private roads

and that the payment of the amount of the damage to be sustained by their opening and the expense of the proceeding "shall be paid by the person to be benefited." In this extension of the law of eminent domain to such a case, in the Constitution of 1846, there was to be no assessment of damages and expenses upon the non-assenting owners of the lands taken for the private road, and the act passed in 1853 by the legislature, regulating the procedure, strictly followed the constitutional requirement in that respect. (Laws of 1853, chap. 174, sec. 14.) When the amendment under consideration was added in 1894, by the force of its own language, as by necessary implication from its association with the other provisions of the section, the plain intent was that the landowner seeking to construct a drain through other lands, *in invitum* their owners, should make compensation for the land appropriated and, himself, bear the expense. The only general laws authorized were those "permitting the owners and occupants of agricultural lands to construct * * * *for the drainage thereof* necessary drains, etc., upon the lands of others, under *proper restrictions and with just compensation.*" This language is not susceptible, by any fair reading, of a construction which warrants the assessment upon the landowner proceeded against of a proportionate share of the damages and expenses. The Constitution, as an instrument framed by the people for the regulation of the government, should be read with the usual significance given to words and phrases by persons of ordinary intelligence and nothing should be implied which would add to the individual burden, or which would be in further derogation of individual rights. That which the words declare, is the meaning of the instrument and neither courts nor legislators have the right to add to, or take from, that meaning. (*Newell* v. *People,* 7 N. Y. 9, 97.) *If the amendment is so read, it only authorizes laws which will enable an agricultural landowner, desirous of draining his lands, to exercise the right of eminent domain and thereunder to appropriate another's lands for the purpose, under such restrictions as shall be deemed proper to be made and*

*upon his making due compensation. No right is conferred, or implied, to assess a portion of the cost and expense upon the other landowners.* Nor could it authorize such an assessment, without violating the Federal Constitution; for that would be to authorize the levying of a tax for a private purpose.

In the enactment of the Drainage Law of 1895, the legislature went far beyond the terms of the constitutional warrant; for the act provided, in addition to the exercise of the right of eminent domain, that a petitioner might compel the cost of the proceeding and of the work to be apportioned between all landowners deemed benefited by the commissioners. The scope and intendment of the law are that the expense of constructing the drain and the damage for the appropriation of property shall be borne by the petitioners jointly with the owners of the land taken, in proportion to benefits accrued. As we have pointed out, the amendment does not authorize this and the legislature has only that general power with respect to taxation as would justify its exercise for public purposes. Private property may be constitutionally taken for public use by taxation, as it may by right of eminent domain, and the compensation which must be specially made in the latter case, when property is taken, is deemed to be received, when property is taken under the power of taxation, in the protection afforded by government to the life, liberty and property of persons; or in the increase of the value of their possessions by the application of their moneys to the public purpose. (*People ex rel. Griffin* v. *Mayor*, 4 N. Y. 419.) In taxation, or in taking private property for public uses, the individual is presumed to receive, or in fact does receive, some equivalent for his contribution. The legislature is, doubtless, the final judge as to what the public necessity and the general good require to be done, as to the extent of taxation therefor and as to its apportionment, and it constitutes no objection to the exercise of the power of taxation that the burden thereof should be laid upon the territorial district, which is exclusively affected by the legislative scheme.

(*Darlington* v. *Mayor*, 31 N. Y. 164.)   That taxation can be
authorized for a purpose not public, is a contradiction in terms
and it would be an illegal assumption of power.   Property is
taken by assessment, which is a form of taxation, as much as
if it were taken by right of eminent domain, and the warrant
for it must be found in some public purpose.   " The right of
eminent domain, or inherent sovereign power, gives the legis-
lature control of private property for public uses, and only for
such uses."   (Per GROVER, J., in *Brevoort* v. *Grace*, 53 N.
Y. 245.)   The plan of the act of 1895 to permit the assess-
ment of the owners of the lands taken for the construction of
a drain was, in my opinion, plainly void under the State and
the Federal Constitutions, as involving the power to levy a tax
for the private purpose of a landowner.   If the legislature can
enforce the construction of a drain at the instance of one per-
son, at the joint cost of himself and of the objecting landown-
ers, the salutary checks imposed upon legislative power for the
protection of the citizen become valueless.   I quite agree,
also, with the views expressed at the Appellate Division, with
respect to the power of taxation conferred by the act.   To
quote from the language of the opinion :   " Under its provis-
ions the authority to tax may be exercised in favor of a single
person for the improvement of a single acre of agricultural
land, a result which we feel certain was not within the con-
templation of the framers of the constitutional provision."
As this act confers the right to take property in derogation of
private rights, it is to be strictly construed.   (*People ex rel.
More* v. *Jefferson County Court*, 56 Barb. 136.)   It has but
one object and that is to enforce the construction of the work
needed to drain, or to protect, agricultural lands at the joint
cost of the petitioner, or petitioners, and of the owners of the
lands taken for the purpose.   All of its provisions are con-
nected as parts of a single scheme, which, in any view, must
fail for the reasons given.

Nor was there any waiver on the part of the respondents of
their right to object.   They opposed the application of the
commissioners to the County Court for the order directing the

entry of judgments against them for the amount of the assessment attempted to be levied upon them. It does not appear that they had consented to any procedure, or that they had estopped themselves by their conduct from opposing the attempt to assess them for the cost and expense of the work.

Upon either of the grounds that I have discussed, the conclusion must be reached that the order and judgment appealed from should be affirmed, with costs.

Parker, Ch. J. While I agree with Judge Gray, that the statute under consideration is violative of the State Constitution, and, therefore, concur with him in the result, I am at the same time confident that it was the design of the recent amendment to section 7 of article 1 of the Constitution to authorize legislation providing a workable scheme by which to secure the drainage of tracts of land, whether large or small, in order to provide for their proper utilization, thus establishing it to be a part of the fundamental law of the state that such drainage constitutes a public use, and that such section is not in conflict with the Federal Constitution.

Gray, J., reads for affirmance of order and judgment, with costs; Parker, Ch. J., and Haight, J., concur in memorandum; O'Brien, Landon and Werner, JJ., concur on second ground stated in opinion; Cullen, J., not sitting.

Order and judgment affirmed.