PEOPLE ex rel. BINGHAM et al. v. STATE WATER SUPPLY CO.

(Supreme Court, Special Term, Livingston County.    December 30, 1910.)

1. NAVIGABLE WATERS (§ 12*)—WATER SUPPLY COMMISSION—IMPROVEMENT OF
WATER COURSE—ASSESSMENT OF COSTS—REVIEW—CERTIORARI.
    The determination of the State Water Supply Commission to include
lands of relator in an improvement district for the assessment of costs
of construction and maintenance of the improvement of a water course
is reviewable by certiorari under Consol. Laws, c. 54, § 12a, as added by
Laws 1909, c. 464, providing that such proceedings shall be reviewable
in like manner as a review is had of the determination of a board of as-
sessors in making an assessment.
    [Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 12.*]

2. NAVIGABLE WATERS (§ 7*)—IMPROVEMENTS—STATE WATER SUPPLY COMMIS-
SION—POWERS—DRAINAGE.
    Consol. Laws, c. 54, § 12a, as added by Laws 1909, c. 464, authorizing
the State Water Supply Commission to improve water courses within the
state by deepening, straightening, and clearing their channels, etc., did
not authorize the commission, either as a part of the improvement of a
water course, or independent thereof, to undertake, at the expense of
neighboring property, the deepening, lengthening, and straightening of
miles of artificial ditches dug in previous years in furtherance of a
drainage scheme which could only be carried out under the general drain-
age act (Laws 1909, c. 20, Consol. Laws, c. 15).
    [Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 7.*]

3. NAVIGABLE WATERS (§ 12*)—IMPROVEMENT OF STREAMS—ASSESSMENT.
    Where an assessment sought to be spread on an assessment district for
improvements by the State Water Supply Commission included the cost
of drainage works which was beyond the commission's jurisdiction, and
the assessment was not severable, it must be held totally void.
    [Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 12.*]

4. NAVIGABLE WATERS (§ 7*)—IMPROVEMENT — DRAINAGE — WATER SUPPLY
COMMISSION—AUTHORITY.
    The State Water Supply Commission cannot acquire jurisdiction to
carry out a drainage scheme in connection with the improvement of cer-
tain water courses on the theory that the two schemes could be advan-
tageously worked together by the commission, one as auxiliary and sup-
plemental to the other, since the right to conduct the drainage proceed-
ings depends on the request or assent of the property owners, whose land
is to be assessed therefor, to the improvement.
    [Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 7.*]

5. NAVIGABLE WATERS (§ 7*)—DRAINAGE SCHEME—WATER SUPPLY COMMISSION
—POWERS.
    The State Water Supply Commission has no jurisdiction under Consol.
Laws, c. 54, § 12a, as revised by Laws 1909, c. 464, authorizing proceed-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ings by the commission to improve water courses, to carry out a drainage scheme as collateral to, or an incident of, the improvement of the water course, on the theory that such drainage is required for the protection of the public health, since, if the drainage is required for the benefit of the public health, it may be efficiently accomplished by proceedings under Laws 1909, c. 20 (Consol. Laws, c. 15), providing for general drainage.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 7.*]

6. NAVIGABLE WATERS (§ 7*)—IMPROVEMENT—"WATER COURSE."

The term "water course" used in connection with "river" in State Boards and Commissions Law (Consol. Laws, c. 54) §§ 10, 11, authorizing proceedings for the improvement of rivers and water courses, means a living stream with defined banks and channel, fed from other and more permanent sources than mere surface water, though not necessarily running all the time, and does not include artificial drainage ditches.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 7.*

For other definitions, see Words and Phrases, vol. 8, pp. 7410–7413; vol. 8, p. 7833.]

7. STATUTES (§ 97*)—SPECIAL LAWS.

A special act for drainage of agricultural lands does not escape the condemnation of the constitutional provision (article 1, § 7, and article 3, § 18) forbidding the passage of any special or local acts for the drainage of agricultural lands, because it is for the preservation of the public health, since no drainage scheme, the expense of which is to be placed partly on non-assenting property owners, is constitutional, unless it has for its object the preservation of public health.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 108, 109; Dec. Dig. § 97.*]

8. NAVIGABLE WATERS (§ 7*)—CURATIVE ACT—EFFECT.

State Boards and Commissions Law (Consol. Laws, c. 54) art. 2, § 22b, as amended by Laws 1909, c. 464, providing that all proceedings previously taken under the provisions of the article and acts amendatory thereof and supplemental thereto are legalized, ratified, and confirmed, was effective only to cure defects arising out of an irregular execution of power, and did not validate proceedings of the State Water Supply Commission in draining certain agricultural lands as a part of the improvement of certain water courses, which drainage proceedings were beyond the commission's jurisdiction.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 7.*]

Certiorari by the People, on the relation of Charles W. Bingham, trustee, and others, etc., against the State Water Supply Commission to review proceedings of the State Water Supply Commission in including lands of relator in the improvement district on which to assess the cost of proposed improvements of Canaseraga creek and its tributaries in Livingston county. Writ granted, and proceedings annulled.

J. M. Hastings and George H. Starr, for relator.
Lockwood R. Doty and John F. Connor, for defendant.

SUTHERLAND, J. The proceedings brought under review by the writ of certiorari herein have to do with the project for improving the water course known as "Canaseraga creek" and its tributaries in the valley between Mt. Morris and Dansville, in Livingston county, which scheme, in 1905, was first laid before the River Improvement Commission, a board created by chapter 734 of the Laws of 1904, and the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plan adopted by that commission was approved and the work authorized to be done by a special act (chapter 419, Laws 1906). By chapter 418, Laws 1906, the powers and duties of the River Improvement Commission were transferred to the State Water Supply Commission. The State Water Supply Commission advertised for bids and received none; and then, procuring authority from the Legislature for greater expenditure, the whole question was taken up de novo, and a new determination for a more extensive improvement was made in 1907, which was ratified and work thereunder authorized by another special act (chapter 195, Laws 1907). The improvement district was created and defined by an order or determination of the commission dated January 10, 1910, and confirmed after hearing objections April 15, 1910, pursuant to section 12a, c. 54, Consol. Laws, as revised by chapter 464, Laws 1909. The determination of the State Water Supply Commission to include the lands of the relator in the improvement district, which is to be subject to assessment for the cost of construction and of the maintenance of the improvement contemplated, is reviewable by certiorari under said section 12a "in like manner as a review is had of a determination of a board of assessors in making an assessment."

The relator asks that his lands be left untaxed for this improvement, alleging many objections to the inclusion of his land which in the main are: (1) That the proceedings of the commission are unlawful and the scheme, as outlined, illegal; and (2) that the lands of the relator will not be benefited by the proposed improvement in any particular, and therefore should be exonerated from assessment, even if the project itself be lawfully conceived.

I have been readily convinced that the improvement contemplated would be of great benefit to an extensive agricultural district, and would largely enhance the value and productiveness of thousands of acres of flat land in the southern part of the district, which are not capable of high cultivation in their present condition owing to the lack of proper drainage, and would tend to lessen the malaria which has prevailed in this region. One of the causes of the inundation of these lands is the periodical overflowing of Canaseraga creek, which follows a meandering course through this flat valley, and has become choked with débris, and in a time of heavy rains or melting snow overflows its banks and spreads out over a wide area. These flood waters make their way slowly toward the north, where finally the Canaseraga empties into the Genesee river at a point near the relator's land. The lands at the north end of the valley near the junction of the Canaseraga and Genesee are flooded not only from the Canaseraga, but also from the Genesee, the waters from which back up the valley southward for several miles in times of high water. It is the contention of those favoring the improvement project that, if the work contemplated is done, there will be a quicker run-off from the Canaseraga watershed, and the crest of the flood from the Canaseraga will pass out through the junction of the Genesee, and so on north toward Lake Ontario, before the crest of the flood from the Genesee watershed has reached that junction point, thereby lessening materially the aggregate of the flood waters of the two streams in the region occupied by the relator's

land. The project contemplates the deepening and straightening of Canaseraga creek, shortening its running length by about six miles between Dansville and Mt. Morris by cut-off channels eliminating loops in the present course, and giving it a uniform fall, and deepening and cleaning up certain smaller creeks which are tributary to the Canaseraga, to the end that a quicker and more even flow of water may be obtained. To this extent, the improvement and the proceedings preparatory thereto seem to be in conformity with the statute which gives the commission jurisdiction to regulate the flow of water in a river or water course, where it is shown to be necessary for the preservation of the public health and safety.

The relator claims that no benefit would accrue to his land from these changes in the water courses, but I do not deem it essential to pass upon that contention at this time, as a decision in favor of the relator is awarded upon other grounds, which appear to me to be controlling.

The defendant commission has gone much further than to project an improvement of the natural water courses referred to, for it has planned and is about to undertake the deepening, lengthening, and straightening of miles of artificial ditches that were dug in past years throughout the southern portions of the district, and the digging of new ditches, for the direct purpose of more thoroughly draining this wide area. This collateral drainage scheme to be effected by ditches, in my opinion, has not been and is not now within the jurisdiction of the River Improvement Commission or its successor, the State Water Supply Commission. However desirable as a public improvement such drainage project may be (and of its value there is no doubt), I am convinced, after careful consideration of the statutes relating to the creation and the definition of the powers of said commission, that it cannot be carried out by the defendant commission, because drainage schemes for agricultural lands are not within the purview of those statutes, and can only be accomplished by proceeding under the general drainage act (chapter 20, Laws 1909, constituting chapter 15 of the Consolidated Laws). And, as the assessment which is about to be spread upon this improved district is not severable, but covers the cost of the entire work, the assessment will be illegal, and the relator's lands must be excluded from any district which is to be subjected to a tax for the double purpose, part legal and part illegal, made manifest by the paper in this case. People ex rel. O'Reilly v. Common Council, 189 N. Y. 66, 81 N. E. 557; Harriman v. Yonkers, 181 N. Y. 24, 73 N. E. 493.

It is no answer to this objection to say that the two schemes can be advantageously worked together by the State Water Supply Commission, one as auxiliary and supplemental to the other; for the efficiency of the plan is not the test of its legality when it involves the drainage of agricultural lands at the expense of property owners who do not request or assent to the improvement.

The history of the drainage laws in this state is long and complicated. They have given rise to much controversy in the courts; and it has seemed necessary, in order to correct abuses that grew up, to have special provisions on the subject inserted in the State Consti-

tution.  At last the statutory law covering the subject has assumed a form under the general drainage act which expresses the result of judicial decisions upon the subject, and seems to be within the lines of constitutional limitation that have been laid down; and any drainage project for agricultural land must be effected in the method defined by that act, and cannot be brought about as an auxiliary element incorporated into and treated as part of a project for the improvement of water courses under a statute creating a commission for the latter purpose.  And, if the protection of the public health demands the carrying out of a drainage scheme similar to the one outlined, that result can be efficiently and legally accomplished by proceeding under the drainage act.

The river improvement act (chapter 743, Laws 1904) refers to natural streams only, and has no application to drainage ditches (and the phraseology of this act has been carried over into article 2 of the state boards and commissions law [Consol. Laws, c. 54], which deals with the State Water Supply Commission).  The petitioners who may set the commission in motion are mentioned in section 2 as "any county, city, town or village located upon any river or water course, or any person or persons possessing riparian rights thereon."  The causes of the "excessive restricted or irregular flow in such river or water course" are to be investigated by the commission (section 3); and the means to attain "a more beneficial flow of water in such river or water course," made available by the act, are "the construction of dikes, clearing out or changing the channel, the erection of a dam or dams or other public works thereon or upon any tributary thereof."  Section 4.

While the word "water course" may be sometimes applied to artificial channels, yet here, in association with the word "river," its use as meaning a natural stream, is in accordance with the practice of law writers generally in treating of the distinction between natural streams and artificial ditches or drains.  In Jeffers v. Jeffers, 107 N. Y. 650, 14 N. E. 316, the Court of Appeals say that in law a water course means "a living stream with defined banks and channel, not necessarily running all the time, but fed from other and more permanent sources than mere surface water."  See Wagner v. Long Island Railway, 2 Hun, 633; Angell on Water Courses, §§ 1–4.  Furthermore, the state Constitution expressly forbids the passage of any special or local act for the drainage of agricultural lands.  Article 1, § 7; article 3, § 18.  The provision in article 1 was inserted in the Constitution in 1895, and that in article 3 was inserted in 1874.  A special act for drainage does not escape the condemnation of the Constitution, even if it is for the preservation of the public health, as no drainage scheme, the expense of which is to be placed partly upon nonassenting property owners, is constitutional unless it has for its object the preservation of the public health.  Matter of Ryers, 72 N. Y. 1, 28 Am. Rep. 88; Matter of Tuthill, 36 App. Div. 492, 55 N. Y. Supp. 657; Id., 163 N. Y. 133, 57 N. E. 303, 49 L. R. A. 781, 79 Am. St. Rep. 574.

Special laws on that subject being prohibited, we should not assume that the Legislature intended, in passing the river improvement act,

to provide for a drainage scheme, inasmuch as no improvement could be actually commenced under that act without a special act approving the determination of the commissioners with reference thereto, and authorizing and directing the work to be done.  Section 4 says:

"No such improvement shall be undertaken under this act pursuant to any such final order, or any other proceedings had thereon except as hereinbefore provided, until after the said final order shall have been approved by a subsequent act of the Legislature, which act shall authorize and specifically designate the improvement singly directed by such final order to be made. If so approved, the said final order shall become effectual and not otherwise."

For the same reason the special acts with reference to this particular improvement (chapter 419, Laws 1906; chapter 195, Laws 1907) are ineffective to legitimatize the drainage part of the project.  In the consolidated state boards and commissions law (chapter 56, Consol. Laws, art. 2, § 22b, as amended by chapter 464, Laws 1909), it is provided:

"All proceedings heretofore taken under the provisions of this article, chapter seven hundred and thirty-four of the laws of nineteen hundred and four, and the acts amendatory thereof and supplemental thereto are hereby legalized, ratified and confirmed."

An omnibus curative act of this description should be construed, not as an attempt to legitimatize acts that were outside the jurisdiction of the commission, but only as confirmation of those acts within the jurisdiction of the commission which may have been imperfectly performed.  The Legislature cannot confirm an act done without power, though it may confirm the irregular execution of a power.  Lewis' Sutherland on Statutory Construction, §§ 676, 677.

Nor can the ditch drainage part of this project be supported upon the theory that such drainage is a mere minor incident necessary to the greater and dominant purpose allowed by the act of the improvement of natural water courses.  The inspection of the plans and maps discloses that the construction of these ditches is one of the main features of the plan as projected, adding much to the expense of construction and maintenance.  The preliminary specifications filed March 1, 1906 (document 6 in the return herein), state under the heading "Work" as follows:

"The work contemplated under these specifications consists of the straightening, deepening and improving of Canaseraga creek, from a point near the village of Dansville, in the county of Livingston, to its junction with the Genesee river; the deepening and improving of the Kishaqua creek, from a point near its crossing of the Dansville & Mount Morris Railway to its junction with the Canaseraga creek; the deepening, improving and straightening of three channels, known as the State ditch, Bradner creek and Mud Run, and other ditches, as the same are shown on the plans filed herewith; the rebuilding of the highway bridges which will be affected by this improvement, and the building of such farm bridges as may be ordered by the engineer in charge."

And under the heading "Excavation," as follows:

"Excavation will be made on the lines shown upon the map.  The earth removed along the Canaseraga creek and along Kishaqua creek will be placed in the form of an embankment along the banks of the two creeks, as improved.  The earth removed from the drainage ditches will be used in filling

low places in the vicinity of these ditches, and be spread as the engineer may direct."

The State ditch referred to in the specifications just quoted, appears to be an artificial channel several miles in length, through private lands, which one of the engineers stated had been originally constructed by the state to take care of leakage from the branch of the Genesee Valley Canal, now abandoned.  See document 3 in the return.  The maps of the improvement show a number of ditches in addition to the State ditch, so-called, which are either to be deepened,. lengthened, and straightened or are to be newly dug, and seem to be designed for drainage only.  These drainage ditches are not necessary in any legal sense to the improvement of the natural water courses.

The improvement of natural water courses by lessening the overflow and providing a ready outlet may better the drainage conditions of adjacent land, and a drainage scheme projected under the drainage act. may legitimately have as one of its features the improvement of a natural water course; and so there is a zone wherein, to some extent at least, the work and result may be the same, whether it is approached from the drainage side or the river improvement side.  In this case, however, the commissions have traveled far beyond the zone of concurrent jurisdiction, and have attempted to occupy territory that does not belong to them.

The learned counsel for the defendant refers with apparent confidence to the opinion of the Court of Appeals in State Water Supply Commission v. Curtis, 192 N. Y. 319, 85 N. E. 148, to sustain the propriety of all that has been done.  That was a case brought before the court upon an agreed state of facts to determine the right of the commission to take by condemnation proceedings certain land for the purpose of the act; and the regularity of the entire procedure of the commissions was stipulated, as well as the necessity in fact that the property in question be taken for the regulation of the flow of Canaseraga creek and its tributaries for the preservation of the public health and safety, which it was conceded was menaced by such flow.

The only points considered by the court were the sufficiency of the notice provided by the act, and the certainty that a landowner whose land is sought to be taken by condemnation, for the purposes of the act, will be paid his compensation.  And the court held that the provision as to notice was sufficient, and that as the landowner would not have to give up his land till he actually received his money for it, the points raised by him were not well taken.  The Court of Appeals did not have the facts before it which are now disclosed to this court, as to the extent of the proposed operations of the commission; so I do not regard the case against Curtis as controlling in any way upon the point which is held to be decisive in the present proceeding.

For the reason that any assessment made by the defendant commission will be void if levied to pay for the drainage work under the plan outlined, the prayer of the petitioner must be granted, and his land must be exonerated from such assessment.